2002 WY 97

**Jerald Dennis KEARNS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 00–305.

Supreme Court of Wyoming.

June 26, 2002.

Michael Pauling, Senior Assistant Attorney General; Theodore Lauer, Director, Prosecution Assistance Program; and Carrie Dawn Tate–Meyer, Student Intern, Representing Appellee. Argument by Ms. Tate–Meyer.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

LEHMAN, Chief Justice.

[¶ 1] Appellant Jerald D. Kearns appeals from the judgment and sentence entered after a jury found him guilty of aggravated robbery and the judge sentenced·him as an habitual criminal.

[¶ 2] We affirm.

### ISSUES

[¶ 3] Kearns presents the following issues for our analysis:

I. Whether the district court made reversible error and erred as a matter of law by not discharging and dismissing the jury once it realized that it had improperly read count 3, habitual criminal.charge including appellant's alleged previous felony convictions, to the jury panel.

II. Whether appellant received ineffective assistance of counsel when appellant's counsel erroneously advised appellant to waive the district court's prejudicial error of informing the jury of count 3 of the information, the habitual criminal charge which included appellant's alleged prior felony convictions.

III. Whether appellant's state and federal constitutional rights not to be placed twice in jeopardy for the same offense were violated by the enhanced penalties of the habitual criminal act.

IV. Whether appellant's conviction for attempted aggravated robbery did not fall within the definition of a violent felony, and the trial court therefore erred in sentencing him as an habitual criminal, and violated his due process rights.

Appellee State of Wyoming offers the following issues for our review:

I. Did appellant voluntarily, knowingly and intelligently waive his right to request

Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Ryan R. Roden, Assistant Appellate Counsel, Representing Appellant. Argument by Mr. Roden.

Hoke MacMillan, Attorney. General; Paul S. Rehurek, Deputy Attorney General; D.

that the court discharge the venire and summon a new venire for his trial?

II. Did appellant receive ineffective assistance of counsel regarding appellant's waiver of his right to request that a new venire be summoned for his trial?

III. Was appellant's right against double jeopardy violated when his prior convictions were used to enhance his sentence as an habitual criminal under Wyo. Stat. § 6–10–201?

IV. Did the trial court properly sentence appellant as an habitual criminal, since appellant was convicted of the violent felony of aggravated robbery, and not of attempted aggravated robbery as appellant contends?

### FACTS

[¶ 4] On August 19, 1999, Kearns was on parole after serving seventeen years of a twenty to twenty-five year sentence for burglary and arson. In 1998, he had been released from the Wyoming State Penitentiary to the Community Alternatives of Casper (CAC). In August of 1999, Kearns was released from CAC. On the morning of August 19, 1999, Kearns decided he wanted to travel to Deadwood, South Dakota, to play some blackjack. He called his parole officer and, instead of asking her if he could travel to Deadwood, he asked her if he could go to Gillette to visit his brother. While the parole officer denied granting Kearns permission to leave town at all, Kearns testified that he believed that she had given her permission as long as he returned to Casper that night. On his way to Deadwood, Kearns purchased a bottle of whiskey to sip on during his trip even though it was a violation of his probation to possess and consume alcohol.

[¶ 5] Kearns spent the day in Deadwood. On his way back to Casper, Kearns spotted a hitchhiker. He picked up the hitchhiker, whose name was Millard Lynd, and loaded Lynd's belongings into the car. As they drove toward Wyoming, the two made small talk. Kearns described Lynd's claims that he had worked undercover for the NYPD, the FBI, and the CIA in Vietnam as "nutty." During this time, Lynd helped himself to some of Kearns' cigarettes, which were on the dash of the car. After two or three cigarettes, Kearns told Lynd that he should just buy the pack from him. Kearns testified that Lynd gave him a handful of coins for the cigarettes.

[¶ 6] Eventually, Kearns pulled onto an off ramp to urinate. Kearns claims that Lynd was yelling at him to hurry up because they needed to get to Gillette before it was too late for him to find a hotel room. According to Kearns, this pushed his last button. This yelling for Kearns to hurry up, the "nutty" talk, and Lynd's taking the cigarettes without permission had irritated Kearns to such a degree that he wanted Lynd out of his car.

[¶ 7] At this point, Kearns' and Lynd's versions of the ensuing struggle conflict substantially. Kearns claims that when he got back in the car, he told Lynd to get out of the car and that when Lynd refused, Kearns reached across Lynd, opened the passenger door and began pushing Lynd out of the car. Kearns said that Lynd fought him pretty hard and even broke the rearview mirror off and began hitting Kearns with it. Once Kearns got Lynd out of the car, he continued toward Gillette. By the time Kearns got to Moorcroft, he testified that he had realized that he still had Lynd's belongings. He said he turned around, intending to return Lynd's things to him. This plan was thwarted, however, when Kearns discovered flashing lights where he had forced Lynd out of the car. Kearns kept driving and dumped the items at an exit near Sundance.

[¶ 8] Lynd's version of the struggle begins with Kearns approaching the passenger door from the outside after he had finished urinating. Lynd said Kearns started hitting him through the passenger window and that when Kearns opened the door, Lynd fell out of the car. At some point during the fight, Lynd realized that he was covered in blood and was being cut by some sort of sharp object. He testified that he kept various coins that he was saving in his wallet, some new American quarters and some foreign coins, and that they ended up in Kearns' possession when Kearns demanded Lynd's money and Lynd handed over his wallet. Lynd explained that after Kearns drove

away, some motorists discovered Lynd and called the sheriff and ambulance. Lynd was taken to the Campbell County Memorial Hospital to be treated for his wounds. Coincidentally, Kearns had also stopped at the Campbell County Memorial Hospital for treatment because he was experiencing severe pain due to a chronic kidney stone condition.

[¶ 9] Officer Gary Spears of the Crook County Sheriff's Department interviewed Lynd at the hospital and was given a description of the alleged assailant and his vehicle. While Officer Spears was at the hospital, he noticed Kearns, and he recognized that Kearns fit the description of Lynd's assailant. Officer Spears proceeded to the parking lot where he found the car that Lynd described. He then approached Kearns and asked him some questions. Officer Spears confiscated Kearns' clothing, and a search revealed some money, including the identifiable coins that belonged to Lynd. Officer Spears then sent the clothing to the Wyoming State Crime Lab for testing.

[¶ 10] On August 20, 1999, Lieutenant William Lessner of the Crook County Sheriff's Department impounded Kearns' car and retrieved Lynd's dumped belongings. Kearns was arrested and charged with attempted first-degree murder, aggravated robbery, and with being an habitual criminal. The jury convicted Kearns of the aggravated robbery charge, and the judge sentenced him under the habitual criminal statute to a term of life imprisonment in the Wyoming State Penitentiary. Kearns makes this timely appeal.

### DISCUSSION

#### A. Waiver

[¶ 11] Kearns claims that the trial court committed reversible error and erred as a matter of law when it failed to discharge the jury panel after the judge mistakenly read the habitual criminal charge, which included information regarding his previous felony convictions. He maintains that the trial court did not possess the discretion to allow Kearns to waive this error. The State replies that Kearns' waiver was valid because the trial court fully informed Kearns of the

mistake and gave him the option of continuing with the sitting jury panel or discharging it and empanelling a new one.

[¶ 12] When analyzing whether the waiver of a personal right was accomplished effectively, we first inquire into whether the right is a waivable right. *Taylor v. State*, 612 P.2d 851, 860–61 (Wyo.1980). If the right is one that can be waived, then we analyze whether the waiver was done voluntarily, knowingly, and intelligently. *Vargas v. State*, 963 P.2d 984, 990 (Wyo.1998). Wyo. Stat. Ann. § 6–10–203 (LexisNexis 2001) applies in cases that involve an habitual criminal charge. It provides:

(a) An information or indictment which charges a person as an habitual criminal shall set forth the charged felony and allege the previous convictions.

(b) The trial on the charged felony shall proceed as in other cases, *but the jury shall not be informed of the previous convictions.* If the defendant is convicted of the charged felony and does not plead guilty to the charge of the previous convictions, he shall be tried immediately by the same jury or judge on the charge of the previous convictions.

(c) In a trial under this article, a duly authenticated copy of the record of previous convictions and judgments against the defendant of any court of record are prima facie evidence of the previous convictions and may be used in evidence against the defendant.

(Emphasis added.)

[¶ 13] At the beginning of the voir dire process, the trial court read the charging information to the jury panel. Instead of just reading the first two counts, however, the judge mistakenly read the third count as well, which included information about Kearns' prior convictions:

Count 3 alleges that on or about the 19th day of August, 1999, in Crook County, Wyoming, that Mr. Kearns, having been previously convicted of three or more felonies separately brought and tried which arose out of separate occurrences, specifically, felony convictions for grand theft and aiding escape in the state of Arizona; a

felony conviction of escape in November 1964 in Arizona; and a felony conviction under the federal law in Louisiana; and felony convictions for aggravated burglary, first degree arson in the State of Wyoming; and that he did commit the crime of attempted murder in the first degree as set out in Count 1 above.

And/or in the alternative, that having had those prior convictions he did commit the crime of aggravated robbery as set out in Count 2 above.

The judge immediately recognized his mistake and met with the prosecutor, defendant, and defense counsel outside the presence of the jury panel to discuss how to proceed:

THE COURT: As I was going through the Information and I was reading the charges to the jury, I got along to Count 3 and as soon as I got into it I realized that I wasn't supposed to be advising the jury of that.

. . .

. . . I tried to get through it as quickly as I could. But it's clearly improper, and we need to discuss what we want to do here. And that may well be that we discharge this jury, the Clerk calls more jurors and we start tomorrow morning.

. . .

I really screwed up here. I should not have told the jury that you are being charged as an habitual criminal. The procedures that we have in place say that you go to trial on the underlying offenses with which you're charged—that would be Counts 1 and Count 2—and if you were convicted of either of those counts, then we move on to the next stage of the trial where if you want the jury to determine whether or not you were in fact an habitual criminal, then the jury would decide that, but their decision on guilt or innocence on Counts 1 or 2 would be totally unaffected in that way by the knowledge about whether or not you were previously convicted of crimes.

So I want you to understand that—that I made an error there and—it's a pretty serious one, and the remedy for that would be that we could just start with a whole new jury that knows nothing about it, but I want you to understand as well that you,

after consultation with your attorney, may have reasons, whatever they are—and you don't need to share them with any of us, but you may have reasons that you want this jury in spite of the fact that I screwed up and told them about prior convictions, and that's entirely up to you after consultation with your attorney.

But I want you to understand unequivocally at this point in time, it's your decision to make, not your attorney[']s. You should listen to his advice, but it's your decision to make and if you want to start tomorrow with an entirely new jury panel, that's what we'll do.

THE DEFENDANT: I'd rather just go forth right now.

THE COURT: Have you talked—

THE DEFENDANT: Yes.

THE COURT:—to Mr. Wolfe?

THE DEFENDANT: Yes, I have.

THE COURT: I don't want to know what your reasons are, but—that's something probably private between you and your attorney, but I'm assuming that you have reasons why you want to proceed with this jury panel instead of putting it off until tomorrow.

THE DEFENDANT: Well, it was going to come out anyway.

THE COURT: Okay.

THE DEFENDANT: I feel I would have preferred that, you know, he bring it out, but it's okay. They was going to know about it anyway.

THE COURT: Because you intend to testify?

THE DEFENDANT: Yes, uh-huh.

THE COURT: Well, you understand you don't have to testify?

THE DEFENDANT: Yes sir, I do.

[¶ 14] Everyone agreed that the jury should be instructed about the information of which they had been mistakenly informed, so the judge explained:

When I was telling you about the charges against Mr. Kearns, I erroneously included in there some information about some prior convictions that he may have suffered.

In our system we try cases based upon the facts of this particular case and not anything else. So you're not—you're to disregard the fact that he may have been convicted previously of any offense, and that's not to be part of your consideration in this case in any way. And if you don't feel like you can set that aside and decide based upon the facts and irrespective of that information, then you need to tell the attorneys about that. The error that I made in that respect the defendant has waived and wants to go ahead with this jury.

[¶ 15] Throughout the voir dire process, defense counsel was afforded the opportunity to inquire into whether the prior convictions would affect the potential jurors' ability to be impartial. At the conclusion of the voir dire process, after the jury was chosen, the judge again gave Kearns the opportunity to discharge the jury and start with a brand new panel in the morning. Kearns reiterated his desire to proceed with the current jury.

[¶ 16] Kearns argues that he should not have been allowed to waive this error because Wyo. Stat. Ann. § 6–10–203 contains mandatory language that prohibits the jury from being informed of any prior convictions at this stage in the trial proceedings. We disagree. Although in early common law an accused was not allowed to waive any rights that were intended for his protection, it is now generally held that a defendant may waive any rights in which the public does not possess an interest or which are not contrary to public policy. *Taylor*, 612 P.2d at 859. Some examples of a defendant's waiver privilege include: the defense of double jeopardy, *Hutchins v. State*, 483 P.2d 519, 521 (Wyo.1971); the right to refuse to testify on the ground of self-incrimination, *Harvey v. State*, 835 P.2d 1074, 1099 (Wyo.1992); the right to request counsel, *Raigosa v. State*, 562 P.2d 1009, 1015 (Wyo.1977); the right to a speedy trial, *Cosco v. State*, 503 P.2d 1403, 1406 (Wyo.1972); and the right to a unanimous jury, *Taylor*, 612 P.2d at 861. This court stated in *Taylor*, "if all of these rights and more can be waived upon what ground can we say that the waiver of jury unanimity is so sacred that it cannot be added to the

list? We perceive of none." *Id.* We echo that sentiment regarding the right to not have a jury be informed of prior convictions for purposes of the habitual criminal statute until the habitual criminal phase of the trial.

[¶ 17] Section 6–10–203 does not declare that this is a right that cannot be waived, nor does it provide a mandatory remedy for situations wherein the jury is prematurely informed of this sort of information. We allow defendants to waive other rights even though the governing rules include similar mandatory language. *See* Wyo. Const. art. 1, § 11 (which provides that "[n]o person shall be compelled to testify against himself in any criminal case, nor shall any person be twice put in jeopardy for the same offense.") *See also* W.R.Cr.P.48 (which provides that "[a] criminal charge shall be brought to trial within 120 days following arraignment unless continued as provided in this rule."). Without express language that this right is not waivable or that if such an error occurs the jury must be dismissed, we are not convinced that this right is "so sacred that it cannot be added to the list" of rights that can be waived.

[¶ 18] While we conclude that this is a right that may be relinquished, we emphasize that waiver can occur only when it is done voluntarily, intelligently, and knowingly in an atmosphere free from express or implied punishment or threat of punishment. To determine whether Kearns voluntarily waived this right, we consider the following exchange:

THE COURT: What I want to make sure you understand is that that's probably—that's probably the kind of an error that you can waive, in other words, you can say, well, I have bigger fish to fry and so it doesn't matter to me. But I want you—I don't want you to feel like there's any pressure—

THE DEFENDANT: No, I don't feel that way at all.

THE COURT:—with this jury because we'll get you a new jury if you want that.

THE DEFENDANT: I don't feel pressured at all. I'd rather go forward with this jury right here.

THE COURT: Okay. All right.

This discussion convinces us that Kearns' decision to waive this right was completely voluntary. Our review of the transcript reveals that the judge in no way pressured Kearns to waive his right. On the contrary, the judge repeatedly assured Kearns that he was absolutely willing to dismiss this jury and start with a new panel in the morning.

[¶ 19] We look again at the transcript to determine whether Kearns' waiver was done knowingly and intelligently:

THE DEFENDANT: Well, see, another thing, too, because the—[the victim] in his testimony is going to say that I told him I was in prison for 17 years, see, so it was going to come out that way, wasn't it?

THE COURT: Maybe. Maybe not. I don't know.

THE DEFENDANT: Anyway, I'd rather go forward. I think it's okay, you know.

THE COURT: Okay. Do you feel like you've discussed that thoroughly with [your attorney]?

THE DEFENDANT: Yes, I have, Your Honor.

In the interest of space, we will not recite every word that was uttered on this topic. The above quoted colloquy is representative. We will say that our review of the transcript reveals lengthy exchanges between the judge and Kearns, which illustrate the judge's complete willingness to dismiss the jury and effort to establish that Kearns was making this decision intelligently and voluntarily. It is clear that Kearns wanted to proceed with the jury knowing the drawbacks of such a decision and despite assurances that it would be no problem to discharge the current jury. Accordingly, we conclude that Kearns' waiver was effective.

## B. *Effective Assistance of Counsel*

 [¶ 20] Kearns asserts that he received ineffective assistance of counsel when his attorney advised him to waive the trial court's error of informing the jury of the prior felony convictions underlying the habitual criminal charge. The State counters that Kearns has failed to prove that his trial counsel provided him with ineffective assistance of counsel. This court articulated our

well established law of ineffective assistance of counsel in *Jackson v. State*, 902 P.2d 1292, 1295 (Wyo.1995). We reiterated this standard in *Grainey v. State*, 997 P.2d 1035, 1038–39 (Wyo.2000):

When reviewing a claim of ineffective assistance of counsel, the paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. *Herdt v. State*, 891 P.2d 793, 796 (Wyo.1995); *Starr v. State*, 888 P.2d 1262, 1266–67 (Wyo. 1995); *Arner v. State*, 872 P.2d 100, 104 (Wyo.1994); *Frias v. State*, 722 P.2d 135, 145 (Wyo.1986). The reviewing court should indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Herdt*, at 796; *Starr*, at 1266; *Arner*, at 104; *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

Under the two-prong standard articulated in *Strickland* and *Frias*, an appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient and that prejudice resulted. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Starr*, at 1266; *King v. State*, 810 P.2d 119, 125 (Wyo.1991) (Cardine, J., dissenting); *Campbell v. State*, 728 P.2d 628, 629 (Wyo.1986); *Frias*, 722 P.2d at 145. In other words, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to "render such assistance as would have been offered by a reasonably competent attorney" and that "counsel's deficiency prejudiced the defense of [the] case." *Lower v. State*, 786 P.2d 346, 349 (Wyo.1990). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064.

[¶ 21] The theory upon which Kearns asserts his ineffective assistance of counsel

claim is that "[t]here is no logical reason why trial counsel, as a matter of strategy, should want a jury that had already been poisoned and prejudiced against his client." We agree with the State that Kearns has failed to satisfy the first prong of the *Strickland* standard by failing to demonstrate that his attorney's performance was deficient. Upon recognizing his error, the judge immediately met with the parties and informed them that he had mistakenly read the information pertaining to Kearns' prior convictions and that he would be happy to dismiss the venire and start fresh the next morning. The lengthy conversations that appear in the record, some of which we reproduced in our discussion on the first issue, convince us that Kearns had sound advice in making his decision to keep the current panel. One additional comment that Kearns made during the discussion on this issue was that at least this way the defense had the opportunity to voir dire the potential jurors on this specific topic to see if the fact that he had prior convictions would prejudice any of them in this case. In our opinion, Kearns made a good point. Given the facts of this case, it was likely a valuable opportunity and good strategy to be able to question the potential jurors about whether Kearns' prior convictions would affect their ability to remain impartial. The fact that the jury ultimately found Kearns guilty of one of the charged crimes does not translate to a conclusion that he should have opted for a new jury. Indeed, the fact that the jury found Kearns not guilty of the attempted first degree murder charge is a good indication that the jury was not determined to convict Kearns of a crime that was not supported by the evidence just because he had prior convictions.

### C. Double Jeopardy

[¶ 22] Kearns contends that his state and federal constitutional rights not to be placed twice in jeopardy for the same offense were violated when the trial court used Kearns' prior convictions to enhance his punishment under the habitual criminal statute. He maintains that because the prior crimes were used to enhance his last sentence, they cannot also be used to enhance his current sentence. The State replies that enhanced punishment under the habitual criminal statute does not result in multiple punishments because being an habitual criminal is a status, not a criminal offense.

[¶ 23] The double jeopardy clause, found in the Fifth Amendment to the United States Constitution and at art. 1, § 11 of the Wyoming Constitution, protects an accused from multiple punishments for the same crime. *Halbleib v. State,* 7 P.3d 45, 47 (Wyo. 2000). The habitual criminal statute, however, does not create new or separate crimes nor does it work to convict a defendant of the crime of being an habitual criminal. *Evans v. State,* 655 P.2d 1214, 1225 (Wyo.1982). Wyo. Stat. Ann. § 6–10–201 (LexisNexis 2001) provides:

(a) A person is an habitual criminal if:

(i) He is convicted of a violent felony; and

(ii) He has been convicted of a felony on two (2) or more previous charges separately brought and tried which arose out of separate occurrences in this state or elsewhere.

(b) An habitual criminal shall be punished by imprisonment for:

(i) Not less than ten (10) years nor more than fifty (50) years, if he has two (2) previous convictions;

(ii) Life, if he has three (3) or more previous convictions.

[¶ 24] The intent behind Wyoming's habitual criminal statute is to provide enhanced punishment to an individual who has engaged in a pattern of violent criminal conduct. For that reason, the fact that some prior crimes have already been used to enhance a sentence does not preclude the use of the same crimes to enhance a later sentence. In fact, to say that a defendant has a clean slate once the offenses are used to enhance a punishment runs completely contrary to the plain language of the statute as well as to what the legislature intended this statute to accomplish:

Habitual criminal statutes, which have been declared to be sound in principle and sustained by reason, are based on the concept that the legislature may require the

courts to take into consideration the persistence of the accused in a criminal course. However, the enhanced punishment authorized under statutes of this kind is an incident of the subsequent offense, that is, the offense for which the accused is being tried, and, on conviction, the defendant is subject to more severe punishment as a result of the incorrigible nature of his conduct demonstrated by the previous criminal record. Accordingly, a statute authorizing the imposition of enhanced punishment on recidivists does not create a separate offense, and one who is indicted as a second or a subsequent offender is not accused of any crime other than the one principally charged. A habitual criminal statute does not punish a defendant for his previous offenses but for his persistence in crime, and it has been said that to be a habitual criminal involves a status rather than the commission of a separate offense.

*Evans*, 655 P.2d at 1220–21 (quoting 39 Am. Jur.2d, *Habitual Criminals and Subsequent Offenders*, § 2, pp. 308–310 (1968)).

[¶ 25] Kearns insists that allowing the prior crimes to be used a second time to enhance his current sentence is tantamount to imposing multiple punishments for the same crime, which was proscribed by this court as violating the defendant's right not to be placed twice in jeopardy in *Cook v. State*, 841 P.2d 1345, 1347 (Wyo.1992). Kearns' reliance on our *Cook* decision is misplaced. It is the repetition of violent criminal conduct that triggers the statute to provide greater penalties for subsequent violent offenses. *Evans*, 655 P.2d at 1225. Habitual criminality is a status rather than a substantive offense, and a finding of such only enhances the punishment for the most recent qualifying offense. *Id.* The trial court did not impose multiple punishments for the same crime. It merely enhanced Kearns' current sentence as a result of Kearns' propensity to persist in his violent criminal ways.

### D. Violent Felony

■ [¶ 26] Kearns finally argues that he was not convicted of a violent felony pursuant to Wyo. Stat. Ann. § 6–10–201(a) and that he, therefore, should not have been sentenced as an habitual criminal. The State insists that the judge misspoke during the sentencing proceeding, calling Kearns' conviction one for attempted aggravated robbery rather than for aggravated robbery and that this error was harmless. During the sentencing proceeding, the judge stated that Kearns had been convicted of attempted aggravated robbery, and this erroneous choice of words was carried over to, and memorialized in, the judgment and sentence. This description of the offense with which Kearns was convicted as attempted aggravated robbery was obviously a mistake because the third amended information charged Kearns with aggravated robbery, the jury instructions instructed the jury on the crime of aggravated robbery, and the jury convicted Kearns of aggravated robbery.

[¶ 27] W.R.Cr.P. 36 applies to clerical errors, and it provides:

Clerical mistakes in judgments, orders or other parts of the record and errors in the record arising from oversight or omission may be corrected by the court at any time and after such notice, if any, as the court orders.

We must, therefore, determine whether the judge's error constituted a clerical error or a judicial error, the latter of which does not fall within the remedial provisions of W.R.Cr.P. 36. *Eddy v. First Wyoming Bank N.A.-Lander*, 713 P.2d 228, 233 (Wyo.1986). This court has previously distinguished the two types of errors by explaining that "all errors, mistakes, or omissions which are not the result of the exercise of the judicial function" may be called clerical errors, while a judicial error is one that is "the deliberate result of judicial reasoning and determination." *Matter of Kimball's Estate*, 583 P.2d 1274, 1277–78 (Wyo.1978) (quoting *Holmes v. Holmes*, 66 Wyo. 317, 211 P.2d 946, 953 (Wyo.1949)).[1]

[¶ 28] In *Holmes*, we made the following attempt to distinguish the two types of errors:

---

1. Although the cases cited in this section are civil, we find them appropriate to this discussion because the corresponding rule for criminal proceedings provides for the same remedy in clerical error situations.

It is said in 30 Am.Jurisprudence 876: "The authority of the court in this connection does not extend beyond the power to make the journal entry speak the truth, and may be exercised only to supply omissions in the exercise of functions which are clerical merely. It is, however, often difficult to distinguish between clerical and judicial errors. The distinction between a clerical error and a judicial one is not dependent upon its source. Clerical errors may include mistakes in papers evidencing the judgment of the court made by the court itself." In 126 A.L.R. 977, it is stated: "Clerical errors in judgments, orders, or decrees are not, by the majority rule, limited to mistakes of the clerk, but include also errors made by the judge where of a clerical or ministerial nature." In 126 A.L.R. 978, it is stated: "Although an error in a judgment, order, or decree was originally made by an attorney when preparing the same for the signature of the judge or clerk, it may none the less be a 'clerical' error." In Sec. 146, Freeman on Judgments, 5th Ed., the author states: "But 'clerical' is employed in a broad sense as contradistinguished from 'judicial' error and covers all errors, mistakes, or omissions which are not the result of the exercise of the judicial function. In other words, the distinction does not depend so much upon the person making the error as upon whether it was the deliberate result of judicial reasoning and determination, regardless of whether it was made by the clerk, by counsel or by the judge. Mistakes of the court are not necessarily judicial error. Thus if the judgment or some provision in it was the result of inadvertence, as where the court was laboring under a mistake or misapprehension as to the state of the record or as to some extrinsic fact, but for which a different judgment would have been rendered, the judgment may be vacated or may be corrected to correspond with what it would have been but for the inadvertence or mistake."

*Holmes,* 211 P.2d at 953.

[¶ 29] We hold that the error in this case was a clerical one. It is clear from the record that the judge's use of the word "attempted" to describe the aggravated robbery conviction was not the deliberate result of judicial reasoning and determination. Indeed, the judge could not have applied any judicial reasoning or made any judicial determination when he described the crime that Kearns had been convicted of as attempted aggravated robbery because he did not have the authority to decide of what crimes Kearns was guilty. The judge's use of the word "attempted" was, instead, a clerical error which may be corrected by virtue of W.R.Cr.P. 36 to accurately reflect the offense of which Kearns was convicted.

[¶ 30] Before a defendant can be sentenced as an habitual criminal, the crime for which he is currently being sentenced must qualify as a violent felony. Because this court has recognized aggravated robbery as a violent felony for purposes of the habitual criminal statute, we hold that the trial court properly sentenced Kearns as an habitual criminal. *Oakley v. State,* 715 P.2d 1374, 1380 (Wyo.1986).

[¶ 31] Affirmed with instructions to the trial court to enter a corrected judgment and sentence pursuant to W.R.Cr.P. 36.