2003 WY 57

**Samuel Thomas URBIGKIT,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

No. 01–208.

Supreme Court of Wyoming.

May 7, 2003.

1208

Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Senior Assistant Appellate Counsel, Representing Appellant.

Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Georgia L. Tibbetts, Senior Assistant Attorney General, Representing Appellee.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1] Samuel Thomas Urbigkit appeals from his conviction on multiple counts of aggravated assault and attempted first-degree murder as well as one count each for being a felon in possession of a firearm, possession of methamphetamine with intent to deliver, conspiring to possess methamphetamine with intent to deliver, and possession of marijuana. Mr. Urbigkit alleges numerous points of error by the trial court, including the denial of his motion to suppress evidence seized on search warrants, denial of his right to a fair trial by being forced to wear shackles in the courtroom, denial of his motion for change of venue, interference in his attorney-client relationship, exclusion of a witness statement, instructing the jury that the prosecution did not have to prove all theories contained in the aggravated assault instructions, insufficiency of the evidence, double jeopardy violations, and cumulative error. We reverse four of the aggravated assault convictions on the grounds of insufficiency of the evidence to support both of the state's alternative theories. Finding no other error, we affirm the convictions on all remaining counts.

## ISSUES

[¶ 2] Mr. Urbigkit presents the following issues for our review:

I. Did the trial court err in denying Appellant's motion to suppress evidence?

II. Did the trial court err in ordering Appellant to be shackled in the presence of the jury, and while testifying?

III. Did the trial court err in denying Appellant's motion to change venue?

IV. Did the failure to swear in the jury prior to the receipt of evidence and testimony constitute reversible error?

V. Was Appellant unable to adequately participate in his own defense due to the state interference into his attorney-client relationship?

VI. Did the trial court err in excluding the statement of Joleen Summers?

VII. Did fundamental error occur when the trial court instructed the jury that the state did not have to prove all theories contained in the aggravated assault charges?

VIII. Was there insufficient evidence to convict Appellant of the aggravated assault charges?

IX. Should the convictions for aggravated assault and attempted first degree murder merge for sentencing purposes; or, has Appellant's right to be free from double jeopardy been violated?

X. Did the trial court commit plain error and deny Appellant his constitutional right to a fair trial by failing to give all instructions to the jury before the closing argument began, in violation of W.R.Cr.P. 30 and W.S. § 7-11-201?

XI. Did the trial court exceed its statutory authority in imposing multiple and consecutive life sentences on Appellant?

XII. Does cumulative error warrant reversal of Appellant's convictions?

The state restates the issues as follows:

I. Did the district court err in denying Appellant's motion to suppress?

II. Was Appellant denied a fair trial or the opportunity to participate in his defense because of the security measures employed during trial?

III. Did the district court err in denying Appellant's motion for a change of venue?

IV. Did the district court commit reversible error in failing to swear in the jury prior to the receipt of testimony or in instructing the jury?

V. Did the district court err in excluding the statements of Joleen Summers?

VI. Was Appellant properly convicted on the six counts of aggravated assault?

VII. Did the district court properly sentence Appellant?

VIII. Was Appellant denied a fair trial due to the cumulative effect of the alleged trial errors?

## FACTS

[¶ 3] On January 25, 2001, Casper police, who had a search warrant for John Logan's vehicle, saw the vehicle traveling on CY Avenue. They stopped it and found an ounce of methamphetamine during their search of the truck. Mr. Logan told the officers he purchased the methamphetamine from Mr. Urbigkit. Mr. Logan subsequently informed law enforcement officials he had purchased methamphetamine from Mr. Urbigkit several times at different locations, including Mr. Urbigkit's shop, and Mr. Urbigkit was always armed, had a number of weapons in his possession, and was violent and dangerous. Law enforcement investigated and conducted surveillance for several days before obtaining search warrants for Mr. Urbigkit's apartment, shop, vehicle, and person.

[¶ 4] On February 7, 2001, law enforcement attempted to execute the warrants at Mr. Urbigkit's shop. Among the law enforcement personnel involved that morning were Department of Criminal Investigation (DCI) Drug Task Force Agents Steve McFarland and Brad Wnuk, DCI Agent Lonnie TeBeest, Natrona County Sheriff's Department Deputies Jim Arnold and Gus Holbrook, Wyoming Highway Patrolman Rick Dye, and Officer Chuck Adkins of the Mills Police Department. As they arrived at the designated meeting place near Mr. Urbigkit's shop, Mr. Urbigkit came out of the building and got into his already running vehicle. They immediately moved in and positioned themselves at various locations around the premises in an attempt to prevent Mr. Urbigkit from leaving the area. As he attempted to maneuver around them and drive off

the premises by way of various access roads, DCI Agent Tim Hill and Agents McFarland and TeBeest tried to block his path with their vehicles. Thinking Mr. Urbigkit would have to surrender his efforts to escape, Agent Wnuk, a passenger in Agent Hill's truck, got out of the truck and walked toward Mr. Urbigkit's vehicle. As Agent Wnuk approached, Mr. Urbigkit accelerated and made a hard turn to the right, causing the back end of his car to spin around toward Agent Hill's truck and Agent Wnuk, who attempted to leap out of the way. Agent Wnuk's hand was struck by the vehicle as it spun away, and his left knee was injured when he hit the ground. Mr. Urbigkit's car came nose to nose with Agent TeBeest's vehicle. Agent TeBeest got out, drew his gun, and pointed it at Mr. Urbigkit. Mr. Urbigkit again accelerated and drove straight toward Agent TeBeest, who jumped up on the hood in order to avoid being hit. He clung to the hood as Mr. Urbigkit continued to accelerate, now heading directly for Agent McFarland's vehicle. As Mr. Urbigkit turned and veered around Agent McFarland, Agent TeBeest let go and rolled off onto the ground. Mr. Urbigkit continued to accelerate, and Agent McFarland fired his gun at him. Agent Wnuk also fired two shots. Mr. Urbigkit drove through a barbed wire fence and into a field to the southwest of the shop area where his car became stuck. He got out of the car and ran across the field. Deputy Arnold and Deputy Holbrook arrived on the scene and, upon sighting Mr. Urbigkit, directed him to put up his hands and drop his weapon. Mr. Urbigkit pointed his gun at them and started firing. They sought cover and returned his fire. Mr. Urbigkit continued to fire at the deputies as he moved north across the field. By this time, Patrolman Dye and Officer Adkins were also at the scene. Patrolman Dye retrieved his rifle and returned Mr. Urbigkit's fire. He fired once and missed, and Mr. Urbigkit began shooting at him and the other officers. Patrolman Dye fired again, and Mr. Urbigkit went down. After a moment, he came up again and fired more shots. Patrolman Dye fired a third shot, and Mr. Urbigkit flopped down again. The officers heard three more shots from where Mr. Urbigkit had fallen and then saw his gun fly up in the air. Law enforcement approached Mr. Urbigkit, handcuffed him, and took him into custody.

[¶ 5] Later, law enforcement executed the warrants and found firearms, ammunition, marijuana, methamphetamine, and other drug paraphernalia. Mr. Urbigkit was charged with seven counts of aggravated assault, four counts of attempted first-degree murder, and one count each of felon in possession of a firearm, possession of a controlled substance (methamphetamine) with intent to deliver, conspiracy to possess with intent to deliver a controlled substance (methamphetamine), and felony possession of a controlled substance (marijuana). After a trial to a jury, Mr. Urbigkit was convicted on all but one count of aggravated assault. In a separate proceeding, Mr. Urbigkit was also found to be a habitual criminal. He was sentenced to terms of life for each conviction of aggravated assault and attempted first-degree murder, two to three years for being a felon in possession of a firearm, and eighteen to twenty years each for the convictions of possession of methamphetamine with intent to deliver, conspiracy to possess methamphetamine with intent to deliver, and felony possession of marijuana.

## DISCUSSION

### A. Suppression of Evidence Seized Pursuant to Search Warrant

[¶ 6] Prior to trial, Mr. Urbigkit filed a motion to suppress the evidence seized pursuant to the search warrants issued on February 6, 2001, contending the affidavits supporting the warrant requests were insufficient to establish probable cause because the information contained in them came from an unreliable source—Mr. Logan. Mr. Urbigkit contended Mr. Logan was unreliable because, while acting as a confidential informant after his arrest, he provided false information to law enforcement concerning where Mr. Urbigkit would most likely be found for purposes of carrying out a controlled buy. Specifically, Mr. Logan allowed law enforcement to believe Mr. Urbigkit was staying at his own apartment when he knew Mr. Urbigkit was at the

apartment of his girlfriend, Johanna Winder. He also provided misinformation concerning Ms. Winder, including telling law enforcement that she was a former girlfriend, he had not spoken to her for months, he did not have a telephone number for Mr. Urbigkit's current girlfriend, and he had been in an apartment on Honeysuckle Street with Mr. Urbigkit where he bought an ounce of methamphetamine but did not know whose apartment it was. When law enforcement discovered a recently called number on Mr. Logan's cellular telephone was that of Mr. Urbigkit's girlfriend and confronted Mr. Logan, he admitted lying concerning the telephone number, the apartment, and how to contact Mr. Urbigkit. Mr. Logan was terminated as an informant.

[¶ 7] The gist of Mr. Urbigkit's argument in his motion to suppress was that the only information law enforcement had of illegal activity on his part came from Mr. Logan, who had proven himself to be unreliable, and such unreliable information was insufficient to establish probable cause for purposes of obtaining search warrants. Mr. Urbigkit further argued law enforcement failed to adequately investigate Mr. Logan's assertions to obtain corroborating evidence of illegal activity on the part of Mr. Urbigkit.

[¶ 8] The trial court denied the motion to suppress, holding the search warrants were valid and a reasonably cautious or prudent person would believe from the affidavits that a crime was being or had been committed justifying issuance of the warrants. With respect to the claim that there was insufficient corroboration of Mr. Logan's statements, the trial court stated:

> There was corroboration of Mr. Urbigkit's existence. There was corroboration of his contact with the Grandview and Honeysuckle residences and with the shop on Foster Road. There was corroboration of his possession of the two vehicles, the gold-colored car and the blue Chevy pickup. There was indication from Mr. Logan that [Mr. Urbigkit] had firearms, and this was corroborated by his previous violent history. And those two seem to be consistent to me. There was corroboration of the association with persons who had a history

of drug use, which corroborates the sale—or the statement that he sold drugs.

[¶ 9] We review the denial of a motion to suppress under an abuse of discretion standard, which means the core of our inquiry focuses upon the reasonableness of the trial court's decision. *Vaughn v. State*, 962 P.2d 149, 151 (Wyo.1998). Traditionally, we have applied a *de novo* review when considering the sufficiency of an affidavit to support the issuance of a search warrant under Article 1, Section 4 of the Wyoming Constitution. *Cordova v. State*, 2001 WY 96, ¶ 10, 33 P.3d 142, ¶ 10 (Wyo.2001). We also have cited federal authority stating that the issuing magistrate's determination of probable cause should be given great deference. *Id.* at ¶ 11, 33 P.3d 142. This deference places the burden of establishing a constitutional violation by a preponderance of the evidence on the party claiming his rights were violated. *Id.* However, we have said such deference is

> "not to be employed to blindly sustain the actions of the magistrate or to place any reviewing court in a position that it may refuse to examine the factual basis for such issuance. To refuse or to fail to do so could result in serious erosion of one of our most valuable constitutional rights, and unless there is factual basis for determination of probable cause this court would be evading its responsibility by failing to declare this to be the case."

*Id.* (quoting *Smith v. State*, 557 P.2d 130, 133 (Wyo.1976)).

[¶ 10] Judicial officers issuing search warrants "must have a substantial basis for concluding that probable cause exists." *Id.* at ¶ 12.

> [T]hey must make a two-fold finding to justify the issuance of a search warrant. First, the factual situation must be sufficient to warrant a reasonably cautious or prudent man to believe that a crime was being committed or that one had been committed. Second, there must be a showing that the fruits of the crime or the

evidence thereof are in the area or structure sought to be searched.

*Id.*

[¶ 11] In the context of an affidavit containing hearsay from "informants," sufficient facts must be presented such that the judicial issuing officer can make an independent judgment as to the informant's credibility, veracity, reliability, and basis of knowledge in determining probable cause exists. *Id.* at ¶ 10. For a judge to issue a search warrant, the affidavit of probable cause must contain sufficient information for an independent determination of the reliability of the statements made therein, which shall include sufficient identification of the source of the information. *Hixson v. State,* 2001 WY 99, ¶ 12, 33 P.3d 154, ¶ 12 (Wyo. 2001).

The affidavit presented to support the issuance of a search warrant is presumed to be valid. It is the affidavit that articulates the facts to supply probable cause, and it must include more than bare conclusions from the affiant. It must demonstrate corroboration of information from a confidential informant and contain verifiable facts.

*Lee v. State,* 2 P.3d 517, 523 (Wyo.2000) (citations omitted).

[¶ 12] Applying these standards, we conclude the search warrants in this case properly issued. Law enforcement submitted three identical affidavits in support of the requests for issuance of warrants to search Mr. Urbigkit's apartment and shop and his girlfriend's apartment. The affidavits contained thirty-two paragraphs. The first paragraph set out the investigating agent's qualifications and experience. The second through the tenth paragraphs described Mr. Urbigkit's criminal history, including a prior conviction for aggravated assault with a weapon, an arrest for possession of a concealed weapon, a prior conviction for possession of a firearm by a convicted felon, and two prior convictions for aggravated assault and battery causing injury. The eleventh through the twenty-eighth paragraphs stated:

On January 25, 2001, your affiant was conducting a drug investigation. Your affiant made contact with John Logan. Logan was found to be in possession of an ounce of methamphetamine.

Logan told your affiant that this methamphetamine came from Samuel T. Urbigkit. Logan explained that he has bought methamphetamine from Urbigkit on at least three [o]cc[a]sions. Each time, Urbigkit sold Logan an ounce of methamphetamine for twelve hundred dollars ($1,200). Logan explained to your affiant that Logan has bought drugs at Urbigkit's apartment, Urbigkit's shop, and Urbigkit has brought the drugs over to Logan's house.

Furthermore, Logan told your affiant substantially the following. He considered Urbigkit a very dangerous person, who was very cautious to avoid police detection. Urbigkit was normally armed, at all times with a firearm. He saw an assault style rifle, which he thought Urbigkit called an AK–47. He saw this gun in Urbigkit's apartment on Grandview Place. He saw this gun around Christmas of 2000. Urbigkit told him that this gun was "full auto." He saw several guns at both Urbigkit's shop and apartment. Logan described seeing: a Glock handgun, a "stub nosed" .22 revolver, a 9 mm handgun. Urbigkit had also made several statements about using the guns on people. He saw that Urbigkit kept one or more handguns, on his person, usually in the pocket of a coat. On January 25, 2001, while at Urbigkit's shop (980 Foster RD), he saw a rifle leaning up against the wall, and a .22 caliber revolver, which was lying on the desk of the shop. The shop was located by the new jail, and across from the bus garage. On this property were two buildings. Urbigkit's shop was located on the South, West corner of the South building. Logan also stated that in January of 2001, when he had bought other ounces of methamphetamine from Urbigkit, he saw Urbigkit in possession of the above described handguns. He saw these guns at Urbigkit's apartment.

Urbigkit lived in an apartment on Grandview Place, Casper, Wyoming. He drove a gold car and a blue pick up. His

shop was behind the Natrona County School bus garage, by the jail.

Following this interview, your affiant and Agent Wnuk drove to the area where it was believed Urbigkit had a shop. Agents confirmed Logan's information, in that there were two business type buildings located across from the school bus garage. Your affiant noticed that at ... 980 Foster Rd, (one of the business rental units), there was a blue Chevy pick up, with Wyoming plates, 1–374BP. Your affiant checked the registration of this pick up, and found that it was registered to Amuel Urbigkit (possibly a typographical error for Samuel) on a blue 1986 Chevy Pickup, at 2261 W. 41 St., Casper, WY. Your affiant checked CPD computer records, and found that 2261 W. 41 St[.], is the home of Urbigkit's parents.

On January 26, 2001, at the direction of your affiant, Logan came to the DCI office and an unsuccessful recorded phone call was made to Urbigkit. (There was no answer). Logan told your affiant substantially the following. Urbigkit had a girlfriend. This girlfriend had a first name of "Johna" or something similar. Logan described her as a white female, about 5′4, [c]urly blonde hair, in her thirties, good looking, lived somewhere in Paradise Valley, and drove a silver car, possibly a Mazda.

Agent Wnuk and your affiant checked the records of the Casper Police Department and found that Urbigkit had an address at 2405 Grandview Place, # 35. CPD records also indicated that in December of 2000, Urbigkit was involved in an argument with two females, Teddi and Jeni Grace. CPD officers were dispatched to 2405 Grandview Place # 35, where they spoke with Jeni Grace and Sam Urbigkit.

On February 1, 2001, Logan again came to the Casper DCI office. Your affiant asked Logan if he knew any way of getting a hold of Urbigkit. Logan stated that he did not. Your affiant assisted Logan in making another recorded phone call to Urbigkit's apartment on Grandview. Again, there was no answer. Your affiant then placed a recording device on Logan and

had him go to Urbigkit's apartment, 2405 Grandview Place # 35. Prior to leaving the DCI parking lot, your affiant searched both Logan and his pick up for drugs or weapons. Your affiant found a red Nokia cell phone in Logan's pick up. No drugs or weapons were found. Logan went to Urbigkit's apartment and knocked on the door. No one answered. Logan then returned to the DCI office.

Your affiant wrote down the numbers stored in "the phone book," as well as the numbers in the "call log" in the Nokia cell phone. Your affiant noted one of the entries as "Sam–Girl" with the number 234–5719. Your affiant also noted that this number was logged as number that had been dialed by this phone. Your affiant then asked Logan about the name and number. Logan stated that the number was "Sam's old girlfriend, Lisa Costalez." Logan then stated that he had not spoken to Costalez for several months. Your affiant then asked Logan again, if he knew any way to get a hold of Urbigkit, or his girlfriend "Johna." Logan said that he thought that Johna had a cell phone, but that he did not have the number. Logan also told your affiant that he had seen Urbigkit at an apartment on Honeysuckle, by the Mini–Mart in Paradise Valley. Logan said that he had been to ... this apartment, and drew a map of the apartment building for agents. The apartment that Urbigkit was in, was located on the second floor, on the West side, of the building. He said that he had been in this apartment with Urbigkit, and had bought an ounce of methamphetamine. He told agents that he was not sure whose apartment it was.

Your affiant then met with his supervisor, Tim Hill and explained the above situation. Hill called U.S. West and received information on the phone number 234–5719 (the number in the red cell phone for "Sam–Girl"). The number came back to Johanna Holbrook, 272 Honeysuckle, Casper, Wyoming.

Your affiant then confronted Logan with the above information. Logan told your affiant substantially the following. He had lied to your affiant. This number did be-

long to Urbigkit's girlfriend, and he had called her earlier that day. She had told him that Urbigkit would not be back until after 4:00 p.m. The reason he had not given this information earlier was that he was scared. He had also been dishonest by not telling agents earlier that Urbigkit could have been at this apartment on Honeysuckle.

Based on the above false information, Logan was terminated as a DCI informant. Logan was booked into the Natrona County Jail for the drugs he possessed on January 25, 2001.

On February 1, 2001, at about 6:30 p.m., your affiant drove to 272 Honeysuckle. Your affiant noted that this building is an apartment building, yellow and brick. It is located on the West side of the street and has a parking lot on the East side. Your affiant noted that there was a gold colored Ford sedan in this driveway with the license plate 1–340DW (registered to Urbigkit).

On February 5, 2001, your affiant again drove by 272 Honeysuckle. Again, your affiant noticed that the gold colored Ford was there, as well as a small silver colored car, with Wyoming license plate, 1–757DF. Your affiant found this car registered to Johanna Winder, 1617 Westridge Court, on a silver 1988 Mazda.

On February 5, 2001, through investigation your affiant learned the following. There was no one listed in the Casper Police Department records, as Johanna Holbrook. Johanna Winder was listed in the CPD records. She had a contact with officers that was drug related in 1997. Winder was listed in CPD records as being a white, 22 year old female, 5'4, 120, blonde hair and blue eyes.

On February 5, 2001, at about 1:20 p.m., your affiant contacted Kevin Whitman, with Probation and Parole. Whitman confirmed that Urbigkit was on parole. Whitman told your affiant that he had not had any problems with Urbigkit. He added that Urbigkit had passed all his urine analysis tests. Whitman had not done any home searches of Urbigkit however.

On February 5, 2001, at about 1:30 p.m., your affiant did further investigation to attempt to confirm information provided by Logan. Your affiant attempted to contact Teddi Grace, but was unable to. Your affiant then called the number listed for Jeni Grace. A woman answered the phone who identified herself to your affiant as Lindee Szewczyk. She told your affiant the following. Her husband used to be married to Jeni Grace. Approximately 2 months ago, Jeni's sister Teddi called her. Teddi told her that Jeni was using a lot of methamphetamine, and was very strung out. Furthermore, Jeni was living with "some bad people" and it would not be prudent to take Jeni's 8 year old son there. She understood that the name of the man who Jeni lived with was "Sam."

Your affiant has confirmed the following information provided to him by Logan. The person, Samuel T. Urbigkit (12/26/62) does exist. Urbigkit lives at an apartment on Grandview. Urbigkit is associated with a girl named Johanna Winder, who seems to be living at 272 Honeysuckle. Johanna Winder has a history of drug use. Urbigkit is on parole. Urbigkit has a propensity towards possessing firearms. Urbigkit has behaved in a violent, dangerous manner. Urbigkit has a gold colored car and a blue [C]hevy pick up. This pick up was parked at 980 Foster Rd, which is indeed a business rental unit, consistent with being a "shop."

[¶ 13]  From these affidavits submitted by a trained and experienced law enforcement officer, the issuing judge learned that, upon being arrested with methamphetamine in his possession, Mr. Logan admitted, against his penal interest, purchasing methamphetamine from Mr. Urbigkit. He further admitted purchasing methamphetamine from the same supplier on at least two other occasions. He provided details based upon firsthand observation concerning the quantity purchased and the amount paid on each occasion. He identified the location of Mr. Urbigkit's apartment and shop where the buys occurred and identified the individual building in which Mr. Urbigkit's shop was located. He also identified the vehicles owned by Mr. Urbigkit. He very specifically identified the vari-

ous firearms in Mr. Urbigkit's possession and described the locations where he had seen them. Mr. Logan also gave a detailed description of Mr. Urbigkit's girlfriend and her vehicle and ultimately identified the location of her apartment where Mr. Urbigkit could be found.

[¶ 14] The law enforcement officer corroborated much of the information provided by Mr. Logan, including the location of the buildings where he met with Mr. Urbigkit, saw the weapons, and purchased methamphetamine. The officer also corroborated the location, make, and model of the vehicles owned by Mr. Urbigkit and the information concerning Mr. Urbigkit's girlfriend. Additionally, the law enforcement official confirmed Mr. Urbigkit's association with people involved with controlled substances. He also checked Mr. Urbigkit's criminal history, which revealed a prior arrest for reckless endangering and possession of a concealed firearm by a convicted felon, two prior convictions for aggravated assault and battery causing injuries, and a prior conviction for aggravated assault with a weapon. Viewing the documents in their totality and giving deference to the judicial issuing officer, we conclude the affidavits were adequate to support a finding of probable cause sufficient for the issuance of the warrants.

[¶ 15] Responding specifically to the contention that probable cause did not exist because Mr. Logan was not reliable, we have said an "informant's description of criminal activity along with firsthand knowledge of the events entitles his information to carry greater weight than it might otherwise." *Cordova,* 2001 WY 96, ¶ 24, 33 P.3d 142. Moreover, an admission against penal interest carries its "own indicia of credibility." *Id.* The affidavits in this case reflected that, in following up on the information provided by Mr. Logan, the investigating agent was able to confirm many of the details he provided. It is true he did not verify every piece of information Mr. Logan supplied, but he is not required to go to those lengths. *Lee,* 2 P.3d at 523–24. Given the specific details furnished by Mr. Logan, his firsthand knowledge and statement against his penal interests, and the verification that the agent did

accomplish, we hold there was ample probable cause to issue the warrants. *See Lee* for a similar result. We find this to be true even though Mr. Logan at one point provided false information to law enforcement. When confronted by the investigating agent, Mr. Logan admitted the information was false and provided new information which law enforcement proceeded to verify. Under these circumstances, we are satisfied the information provided was reasonably trustworthy.

## B. Shackling

■ [¶ 16] Mr. Urbigkit contends he was denied his right to a fair trial by being forced to wear shackles in the courtroom during trial. The record is less than clear with respect to this issue. The parties' briefs are no more helpful. Mr. Urbigkit asserts "[i]t appears clearly on the face of the record that [he] was shackled" but offers no record cites to support the assertion. The state "assumes that [Mr. Urbigkit] was shackled while testifying" but asserts "the record is unclear that such was the case." Despite the state of the record, we are able to piece together the following events of significance to our review.

[¶ 17] Prior to trial, Mr. Urbigkit filed motions requesting that his hands be free of restraint during trial and courtroom procedures be established to prevent the jury from seeing him shackled. The state responded to Mr. Urbigkit's motions in relevant part as follows: "The State would defer to the Court and its security personnel as to what restraints are appropriate.... In doing so, the Court should consider the defendant's long history of violence and apparent willingness to use that violence to escape responsibility." Without hearing argument, the trial court deferred ruling on the defense motion until trial and after consultation with the bailiff.

[¶ 18] At some point thereafter, but prior to the commencement of trial, the trial court ruled off the record that it would "accede to the sheriff's request that [Mr. Urbigkit] have his right hand free but his other hand be shackled and he have leg chains." There is no indication from the record how or when this off-the-record ruling occurred so we do not know whether the parties had the oppor-

tunity to present argument prior to the ruling, nor do we know the factors considered or reasoning relied upon by the court. Mr. Urbigkit does not challenge the off-the-record ruling as a violation of W.R.Cr.P. 12(h), and we, therefore, do not consider that issue.

[¶ 19] On the first day of trial prior to *voir dire*, Mr. Urbigkit raised the shackling issue again. This time, the state actively argued against the motion on the basis of Mr. Urbigkit's history of violence, the nature of the charges against him, and letters he wrote while in jail awaiting trial allegedly reflecting violent tendencies on his part and containing references to possible opportunities to escape.[1] The letters contained in the record on appeal do not reflect the statements referenced by the state in its argument; however, other letters which are part of the record reflect what can be fairly characterized as Mr. Urbigkit's enjoyment of being an "outlaw" and tangling with law enforcement. Following the arguments of counsel, the trial court stuck by its earlier off-the-record ruling requiring Mr. Urbigkit's left arm and legs to be shackled during trial. There is nothing in the record to indicate the trial court departed from this ruling, and it appears Mr. Urbigkit was shackled in this manner throughout *voir dire*, opening statements, and the state's presentation of evidence.

[¶ 20] At the close of the prosecution's case, prior to Mr. Urbigkit taking the stand, defense counsel asked for clarification on whether he would be required to testify in shackles. A brief discussion followed concerning whether it was preferable for Mr. Urbigkit to testify in shackles or be unshackled and have three officers stand near him as he testified. It appears the trial court considered these alternatives and gave Mr. Ur-

bigkit the choice of testifying in shackles or being surrounded by three law enforcement officials. It also appears Mr. Urbigkit took the stand in shackles and was sworn outside the presence of the jury, the jury was then seated, and Mr. Urbigkit testified before the jury in shackles from the witness stand.

[¶ 21] At some point during this time frame, an off-the-record discussion took place outside the presence of the jury among the trial court, the state, defense counsel, and Mr. Urbigkit concerning Mr. Urbigkit standing before the jury away from the witness stand and testifying with the aid of an exhibit. Apparently, the trial court arrived at some rules concerning this testimony and conveyed those to Mr. Urbigkit off the record, including that his legs would remain shackled and he was not to move. Again the record is not clear in this regard, but it appears his hands were free during this part of his testimony.

[¶ 22] With these events in mind, we turn to an examination of the law relating to the shackling of a criminal defendant in the presence of a jury. We addressed the issue most recently in *Asch v. State*, 2003 WY 18, ¶ 62, 62 P.3d 945, ¶ 62 (Wyo.2003) (some citations omitted), a case published after Mr. Urbigkit's trial where we held:

> [I]n future cases, defendants shall not be shackled or otherwise physically restrained in the courtroom during a jury trial, nor shall other exceptional security measures be utilized, unless the State has first moved that such measures be utilized, the court has heard such motion, and after allowing the defendant an opportunity to contest the motion, the court has stated on the record the compelling reasons justifying the measures. At such hearing, the State has the burden of establishing the

---

1. The state described the letters to the trial court as follows:

Just Thursday night, we seized a series of letters from the home of Johanna Winder; and just a few quotes, I think, are pertinent to the record.

He's talking about fighting. Got to get back in fighting fit as soon as possible. Never know when the chance will come.

He's made comments to the nurses in the jail that he—if they have to pull him off the fence, that he would try it.

Another comment, if he gets convicted, he thought he could get a commutation in 15 years, stating, ["]But I'm not going to be hanging around that long.["]

He—there's a number of comments through here that he says, ["]You never know when your chance might come.["]

And he talks about if the van crashed, that would be a chance; that he would take a chance even if it was a long one.

necessity for particular restraints and that such restraints are the least drastic effective measures available. The trial court must consider alternatives, and may not rely blindly on the judgment of correctional officers. In exercising its discretion, the court should consider at least the following factors: " '[T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes, his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and the mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.' " [*State v.*] *Finch,* 137 Wash.2d 792, 975 P.2d [967,] 1002 [ (1999) ] (*quoting State v. Hartzog,* 96 Wash.2d 383, 400, 635 P.2d 694 (1981)).

Applying these principles, we held the trial court abused its discretion in allowing the defendant to be shackled in the courtroom throughout his trial without first requiring the state to justify such restraints on the record. Of significance in applying that holding to this case is that the defendant was charged with felony possession of methamphetamine and misdemeanor interference with a peace officer (for lying about his identity). There is nothing in *Asch* to indicate violent behavior or use of a deadly weapon justifying the use of restraints, which clearly distinguishes it from the present case. With this distinction in mind, we turn to application of the *Asch* holding to the facts before us.

[¶ 23] While noting again that Mr. Urbigkit's trial occurred before the *Asch* opinion was issued, we conclude that what occurred here comes uncomfortably close to violating the standards enunciated in *Asch* in two respects. First, the trial court made its initial ruling off the record leaving us to speculate as to its reasoning. Then, when it later announced its decision to adhere to its earlier ruling, the trial court gave only a cursory explanation of its reasoning. Second, there are indications in the record that the trial court relied heavily (although perhaps not "blindly") on the judgment of law enforcement. What we hoped to accomplish in *Asch* is for trial courts to conduct a thorough, independent, case-by-case review of whether restraints are necessary rather than allowing law enforcement to establish a procedure which is followed by rote in criminal cases. While the record before us does not indicate as clearly as we would like that the trial court considered the issue thoroughly and independently, we conclude the manner in which the shackling issue was resolved generally complied with the spirit of *Asch.*

[¶ 24] The state presented argument that restraints were necessary given Mr. Urbigkit was charged with seven counts of aggravated assault and four counts of attempted first-degree murder. The state further argued that Mr. Urbigkit's history of violence, which included three prior convictions for aggravated assault and battery and one prior conviction for possession of a firearm, made restraints necessary. Finally, the state argued that letters written by Mr. Urbigkit while incarcerated and awaiting trial indicated a propensity for violence and a desire to escape. Again, the letters included in the record do not contain the statements referenced by the state, but they do demonstrate Mr. Urbigkit's clear disdain for law enforcement and law and order in general. The trial court heard the state's arguments for using restraints in open court just prior to trial. Mr. Urbigkit had an opportunity to respond, and then the trial court stated on the record that there were sufficient security concerns to justify the use of restraints. It is apparent from the record that the trial court felt compelling reasons existed for the use of restraints. There is no question Mr. Urbigkit's history and the conduct leading to the charges in this case demonstrate a pattern of violent behavior. It is also apparent the trial court considered alternative measures, including having additional law enforcement personnel in the courtroom during Mr. Urbigkit's testimony. Although we continue to urge trial courts and counsel in the future to insure the record demonstrates the standards in *Asch* were followed, in this case, we find the state adequately justified the use of restraints on the record and the trial court did not abuse its discretion in requiring Mr. Urbigkit to be shackled in the courtroom throughout his trial.

## C. Motion for Change of Venue

[¶ 25] Prior to trial, Mr. Urbigkit moved for a change of venue on the ground that extensive pretrial publicity made it impossible for him to receive a fair trial in Natrona County. He also argued that publicity implicating him in a homicide investigation created the risk that he would be convicted on a charge not yet filed. At a pretrial hearing, the trial court denied the motion without prejudice, reserving Mr. Urbigkit's right to renew the motion following *voir dire*. When defense counsel renewed the motion after *voir dire*, the trial court again denied it.

[¶ 26] We review the denial of a motion for change of venue under an abuse of discretion standard, meaning we will not interfere with the trial court's decision unless the trial court acted in a manner exceeding the bounds of reason under the circumstances. *Nixon v. State*, 994 P.2d 324, 326–27 (Wyo.1999). The party moving for change of venue has the burden of showing actual prejudice in the minds of the jurors so great that a fair trial cannot be obtained. *Id.* at 327.

[¶ 27] We have summarized the law in Wyoming relating to change of venue as follows:

Criminal defendants in Wyoming have a constitutional right to a trial by an impartial jury. Wyoming's constitutional provision grants the right to trial "by an impartial jury of the county or district in which the offense is alleged to have been committed." Wyo. Const. art. 1, § 10. The legislative provision mirroring the constitution requires "[e]very criminal case shall be tried in the county in which the indictment or offense charged is found, except as otherwise provided by law." Wyo. Stat. Ann. § 1–7–102(a) (LEXIS 1999). Trial proceedings are transferred to another county "only if the court is satisfied that there exists within the county where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial in that county." W.R.Cr.P. 21(a).

This Court has adopted a two-part test for determining whether a change of venue should be granted after *voir dire* because of pre-trial publicity: " 'First, the nature and extent of the publicity must be considered; second, the difficulty or ease in selecting a jury must be considered along with the amount of prejudice which actually appears during *voir dire* examination.' " *Sides [v. State ]*, 963 P.2d [227,] 231 [ (Wyo. 1998) ] (quoting *Murry [v. State ]*, 713 P.2d [202,] 208 [ (Wyo.1986) ] ).

*Id.* (citation omitted).

[¶ 28] Regarding the first prong of the test, Mr. Urbigkit provided the trial court with twelve articles from the local newspaper referencing the circumstances of his arrest, the charges filed against him in this case, other persons facing similar charges with whom he allegedly had ties, and a homicide being investigated by local police. Several of the articles also referenced Mr. Urbigkit in relation to the homicide investigation. While the press coverage was not insignificant[2] in the months of February and March of 2001, the last article appearing in the record is dated April 5, 2001, approximately three months before trial. The articles are generally factual in nature, reporting information obtained from court documents, and we do not find them to be sensational, inflammatory, or grossly prejudicial. Neither the nature nor the extent of the news coverage justifies a finding that the trial court abused its discretion in denying the motion under the first prong of the test for determining whether a change of venue was appropriate.

[¶ 29] As for the second prong of the test, the difficulty or ease of jury selection or the amount of prejudice appearing during *voir dire*, we likewise see nothing in the record requiring reversal. Only five of the forty-eight prospective jurors expressed concern about their ability to be fair and impartial because of the pretrial publicity. None of the five remained on the jury. There is simply no indication in the record that the pretrial publicity in this case made jury selection more difficult or created such prejudice that a change of venue was appropriate. We affirm the trial court's order denying the motion for a change of venue.

**2.** The attachments to Mr. Urbigkit's motion for a change of venue reflect that over the eight-week period between February 9, 2001, and April 5, 2001, the local newspaper printed twelve articles mentioning Mr. Urbigkit and the events of February 7, 2001.

## D. Failure to Swear Jury

[¶ 30] On the afternoon of the second day of trial, it came to the trial court's attention that the jury had not been sworn in accordance with Wyo. Stat. Ann. § 7–11–107 (LexisNexis 2001), which provides:

> As soon as the jury is selected an oath or affirmation shall be administered to the jurors providing, in substance, that they and each of them will well and truly try the matter in issue between the state of Wyoming, plaintiff, and the named defendant, and render a true verdict according to the evidence.

The trial court excused the jury, informed the parties of what had happened, and recessed early to allow them an opportunity to research the issue and decide how they wished to proceed. When court was reconvened the following morning, defense counsel moved for a mistrial, arguing the statute is mandatory, not permissive, and prejudice to Mr. Urbigkit was inherent. The trial court denied the motion, citing case law holding that error in failing to swear a jury is not reversible in the absence of actual prejudice where the error is discovered and corrected prior to commencement of deliberation. The trial court informed the jury of the error and administered the oath. The trial court also confirmed with the jury the importance of the oath, its duty to follow the court's instructions, and its duty to determine the facts from all the evidence presented and arrive at a verdict free from prejudice.

[¶ 31] The question of whether it is reversible error to inadvertently fail to administer the oath to the jury is one of first impression in Wyoming. Under the circumstances presented here, we agree with the holding in *People v. Clouse*, 859 P.2d 228, 233 (Colo.Ct.App.1992), that the failure to administer the oath constituted harmless error. The mistake was discovered in the afternoon of the second day of a seven-day trial after the testimony of only three of thirty-seven witnesses testifying for the state. As in *Clouse*, the jury was sworn in long before deliberations, and the jury was informed it was to consider all the evidence presented, both before and after the oath, in the same manner. Finding no prejudice, we uphold the trial court's ruling in this regard.

## E. Interference in Attorney–Client Relationship

[¶ 32] On the first day of trial, a deputy was seated near the defense table where Mr. Urbigkit and his attorneys were seated. Prior to jury selection, defense counsel objected to the officer's presence on the basis that it would have a chilling effect on Mr. Urbigkit's ability to communicate with his attorneys and would give the jury the impression he was dangerous. The trial court ruled that the deputy would remain where he was, stating as follows:

> I would note for the record that the deputy has been advised that if he overhears any conversation between any of the defense counsel, including their intern, and Mr. Urbigkit, that he is not to reveal that to anyone. He's indicated his understanding of that and indicated that he had previously been advised of that sacred requirement.
>
> And in addition, for the record, the deputy is sitting in a chair along the wall and at midpoint, half point, between the prosecutor's table and defense table and as far as practicable as possible from Mr. Urbigkit, so he shouldn't overhear any conversations to start with.

Mr. Urbigkit claims on appeal that the deputy's presence denied him the right to effectively defend and participate in his defense guaranteed by the United States and Wyoming Constitutions. U.S. Const. amends. V, VI; Wyo. Const. art. 1, §§ 6, 10.

[¶ 33] It has long been recognized that, under some circumstances, a defendant's Sixth Amendment rights may be violated by the state's intrusion into the attorney-client relationship. *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981); *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). The premise of cases recognizing this principle, however, is that "the constitutional infringement ... has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defendant." *Morrison*, 449 U.S. at 365, 101 S.Ct. 665. Where there is no demonstration of prejudice of any kind to the ability of defense counsel to provide adequate representation, there is no basis for invoking the Sixth Amendment

to interfere with the criminal proceeding. *Id.*

[¶ 34] Here, there is no evidence the deputy seated near defense counsel heard anything said by Mr. Urbigkit and his attorneys, nor is there an allegation of prejudice resulting from use of such information by the prosecution at trial. Mr. Urbigkit also presents no evidence of prejudice in terms of conversations he would have had but did not have because of the deputy's presence, nor does he provide other specifics as to how his defense was different because of the seating arrangement. Under these circumstances, we uphold the trial court's decision.

## F. Exclusion of Witness Statement

[¶ 35] Approximately two and one-half hours after the shooting events of February 7, 2001, Steven Freel, a police officer, interviewed Joleen Summers, one of the passengers in Mr. Urbigkit's vehicle during the shooting, at the Natrona County Detention Center. During that interview, Officer Freel asked Ms. Summers what happened that morning. Ms. Summers responded as follows:

> I was in the car and the next thing I know there's cars all around and there's a shot, we start getting shot at and it's there no, somebody says, get the hell out and I fell out of the car and I started walking and the cops said, put your hands up. An investigator put me in handcuffs.

At trial, defense counsel sought to question Officer Freel about Ms. Summer's statement. The state objected to testimony concerning Ms. Summer's statement on hearsay grounds. Defense counsel responded that the statement fell within the excited utterance and the statement against interest exceptions to the hearsay rule. The trial court sustained the objection, precluding defense counsel from introducing the statement or eliciting testimony about it.

[¶ 36] The trial court's decisions with respect to the admissibility of evidence are entitled to considerable deference, and, as long as there exists a legitimate basis for the trial court's ruling, we will not reverse that ruling on appeal. *Lawson v. State*, 994 P.2d 943, 947 (Wyo.2000).

[¶ 37] W.R.E. 803(2) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

Citing this provision, Mr. Urbigkit argues the statement was admissible because, only a short time before, Ms. Summers had been in the midst of a gun battle, and Officer Freel testified she was nervous and excited when she made the statement. Citing *James v. State*, 888 P.2d 200, 206 (Wyo.1994), Mr. Urbigkit further argues that neither the lapse of approximately two and one-half hours between the gun battle and the utterance nor the fact that Ms. Summers made the statement in response to the question "what happened this morning" was dispositive of whether the exception in W.R.E. 803(2) applied.

[¶ 38] Mr. Urbigkit's citations to *James* are correct as far as they go. *James* sets out five factors to be considered in determining whether the excited utterance exception applies, which include the nature of the startling event, the declarant's physical manifestations of excitement, the declarant's age, the lapse of time between the event and the statement, and whether the statement was made in response to an inquiry. *James* also held, as Mr. Urbigkit claims, that lapse of time and the fact a statement is made in response to an inquiry do not necessarily mean a statement is not an excited utterance. However, as was said in *James*, the ultimate inquiry is whether the declarant's condition at the time was such that the statement was spontaneous, excited, or impulsive and the result of stress from the events witnessed rather than the product of reflection and deliberation. 888 P.2d at 207. On this basis, we upheld the admission of the statements at issue in *James* because there was ample evidence the declarant was hysterical at the time she made them fifteen to twenty minutes after observing the events.

[¶ 39] Rulings as to the admissibility of evidence are within the sound discretion of the trial court, and we will not disturb those

rulings absent a clear abuse of that discretion. *Id.* at 206. We will not find an abuse of discretion as long as a legitimate basis exists for a ruling. *Dike v. State,* 990 P.2d 1012, 1020–21 (Wyo.1999). It is only when the trial court acted in a manner exceeding the bounds of reason that we find an abuse of discretion. *Id.* at 1021. Applying this standard, we are unable to say the trial court abused its discretion in precluding the statement of Ms. Summers. While the event itself was no doubt startling, the record establishes that the statement was made by an adult in response to a police inquiry at the detention center approximately two and one-half hours after the event. In that sense, it is not clear it was a spontaneous utterance in response to the event itself. By itself, Officer Freel's testimony that Ms. Summers seemed excited or nervous at the time is not enough to bring the statement within W.R.E. 803(2).

■ [¶ 40] Mr. Urbigkit also contends the statement of Ms. Summers was admissible as a statement against interest under W.R.E. 804(b)(3), which provides:

(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Defense counsel argued at trial that the statement "get the hell out" of the car was against Ms. Summers' interest because, at the time she made the statement, she was under arrest and subject to potential penalties for interfering with law enforcement. Like the trial court, we fail to see how the words "get the hell out" of the car is a statement against interest. We find the trial

court did not abuse its discretion in precluding the statement.

**G. Instructing Jury That State Did Not Have to Prove All Theories on Aggravated Assault**

■ [¶ 41] Mr. Urbigkit contends plain error occurred when the trial court instructed the jury that the state did not have to prove every element of the crime charged when the word "or" appeared in the instruction. He refers to Instruction No. 9 which stated in pertinent part:

YOU ARE INSTRUCTED that the Information in this case provides in pertinent part as follows:

"COMES NOW … Assistant District Attorney, Seventh Judicial District, State of Wyoming, and in the name and by the authority of the State of Wyoming, informs the Court and gives the Court to understand

*COUNT ONE*

That Samuel Urbigkit late of the County aforesaid, on or about the 7th day of February, 2001, in the County of Natrona, in the State of Wyoming, *did unlawfully and knowingly cause or attempt to cause bodily injury* to another, namely: Brad Wnuk, *with a deadly weapon,* namely a motor vehicle, *or did threaten to use a drawn deadly weapon* on another, in violation of W.S.1977, § 6–2–502[.]"

(Emphasis added.) Except for the name of the victim, the instruction contains the identical language for counts two and three. Counts four through seven are also identical except for the victim's name and the substitution of the words "namely a firearm" for "namely a motor vehicle." The jury was given the further additional instruction with respect to each count:

YOU ARE INSTRUCTED that the elements of the crime of Aggravated Assault and Battery, as charged in Count One of this case, are:

1. On or about the 7th day of February, 2001

2. In the County of Natrona, and State of Wyoming

3. The Defendant, Samuel Urbigkit

4. *Attempted to cause or knowingly caused*

5. ***Bodily injury*** to another namely [victim's name]

6. ***With a deadly weapon***

***OR***

7. ***Did threaten another*** namely [victim's name]

8. ***With a drawn deadly weapon,*** to-wit a motor vehicle.

(Emphasis added.) Mr. Urbigkit was convicted on six counts of aggravated assault and battery, two for using a motor vehicle as a deadly weapon and four for using a firearm as a deadly weapon. He contends these convictions cannot stand because it is not clear on what ground the jury based its finding of guilt—knowingly causing **or** attempting to cause bodily injury with a deadly weapon **or** threatening another with a deadly weapon. Mr. Urbigkit asserts juror confusion was apparent because the jury asked the following question during deliberations: "Does the 'or' on count[s] 1–7 mean that 4–6 must be proved or 7–8 or 4–8 must be proved Inclusive?" He alleges plain error occurred when the trial court answered the question as follows: "You are instructed that the word 'or' refers to two separate theories. The State may prove either theory, but does not have to prove both." We review the question for plain error because defense counsel did not object to the court's instruction. Therefore, Mr. Urbigkit must prove that a clear and unequivocal rule of law was violated in a clear and obvious way resulting in denial of a substantial right and material prejudice.

▮▮▮▮ [¶ 42] In two recent cases, we addressed the issue of the state's failure to particularize which portions of a criminal statute it was relying upon for conviction. *May v. State,* 2003 WY 14, 62 P.3d 574 (Wyo.2003); *Tanner v. State,* 2002 WY 170, 57 P.3d 1242 (Wyo.2002). Prior to those cases, we also addressed the issue in *Bush v. State,* 908 P.2d 963, 966 (Wyo.1995), wherein we held that a verdict must be set aside in cases where the verdict is supportable on one ground but not on another and it is impossible to tell which ground the jury selected. As in the present case, all three of those prior cases—*Bush, Tanner,* and *May*—involved charging documents and jury instructions which quoted language directly from a criminal statute containing alternative grounds for conviction of the crime charged. *Bush* and *Tanner* concerned Wyoming's burglary statute while *May* involved aggravated burglary; in each case, however, the jury was instructed that the defendant was guilty of the crime charged if the evidence showed he entered a building without authority with the intent to commit larceny **or** the intent to commit a felony. Because the evidence was not sufficient to show entry with the intent to commit **both** larceny and a felony, we reversed the burglary convictions in *Bush* and *Tanner* and the aggravated burglary conviction in *May.* While those cases involved sufficiency of the evidence claims rather than error in instructing the jury as Mr. Urbigkit claims, they make it clear that, where a jury is instructed in the alternative and returns a general verdict of guilty, the evidence in the record must support the conviction on each alternative ground.

[¶ 43] In the present case, Mr. Urbigkit claims error occurred when the trial court told the jury the state did not have to prove all theories set forth in the instructions—causing **and** attempting to cause injury **and** threatening to cause injury. Under the foregoing cases, and a long line of cases before them, the trial court's instruction to the jury was not a correct statement of Wyoming law. Under the plain error doctrine, Mr. Urbigkit has established that the instruction violated a clear and unequivocal rule of law in a clear and obvious way. The question then becomes whether that violation resulted in the denial of a substantial right and material prejudice. The answer to that question turns upon whether there was substantial evidence to support a guilty verdict on both theories contained in the instructions. If there was substantial evidence supporting both theories, it is difficult to see how the trial court's instruction resulted in the denial of a substantial right or material prejudice. If, however, substantial evidence did not support a finding of guilt on both theories, the instruction did result in the denial of a substantial right and material prejudice.

### H. Sufficiency of the Evidence on the Aggravated Assault Charges

▮▮▮▮▮ [¶ 44] Our standard for reviewing sufficiency of the evidence claims is well settled:

When reviewing a sufficiency of the evidence claim in a criminal case, we must determine whether a rational trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. We do not consider conflicting evidence presented by the unsuccessful party, and afford every favorable inference which may be reasonably and fairly drawn from the successful party's evidence. We have consistently held that it is the jury's responsibility to resolve conflicts in the evidence. "We will not substitute our judgment for that of the jury, ... our only duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did." [*Bloomquist v. State*, 914 P.2d 812, 824 (Wyo. 1996)].

*Williams v. State*, 986 P.2d 855, 857 (Wyo. 1999) (some citations omitted); *see also May*, 2003 WY 14, ¶ 11, 62 P.3d 574.

[¶ 45] We turn to the question of whether there was sufficient evidence to support the convictions for aggravated assault and battery based upon the theories identified in the instructions—that Mr. Urbigkit knowingly caused **or** attempted to cause bodily injury to another with a deadly weapon **or** threatened to use a deadly weapon on another. Under the *Bush* line of cases, there must be sufficient evidence that Mr. Urbigkit caused injury, attempted to cause injury, **and** threatened to use a deadly weapon in order for the convictions to stand. Under the particular facts of this case as they appear in the record, if there was sufficient evidence showing Mr. Urbigkit knowingly caused injury to the victims, the evidence likewise was sufficient to establish the attempt and the threat to cause injury. In order to uphold the jury verdict on the six counts of aggravated assault and battery, therefore, there must be sufficient evidence of an injury on each count.

[¶ 46] The evidence with regard to Mr. Urbigkit's use of his motor vehicle as a deadly weapon showed he turned his vehicle hard to the right, causing the back to swing around toward Agent Wnuk, who testified he would have been hit if he had not jumped out of the way. Even so, Mr. Urbigkit's vehicle and Agent Wnuk's hand came into contact as the vehicle spun around. Agent Wnuk injured his left knee in the course of trying to avoid being hit. The evidence further showed Mr. Urbigkit drove his car directly at Agent TeBeest, accelerating as he went and forcing Agent TeBeest to jump onto the hood of the car to avoid being hit. Mr. Urbigkit testified he had no thought of stopping his vehicle when Agent TeBeest was up on his hood. Instead, he continued to accelerate, scaring Agent TeBeest and causing him to let go and roll off the hood.

[¶ 47] With respect to the aggravated assault charges arising out of his use of a firearm, the evidence showed Mr. Urbigkit fired his gun multiple times at Deputy Arnold, Deputy Holbrook, Patrolman Dye, and Officer Adkins. Mr. Urbigkit testified he knew he was threatening the officers' well-being when he fired his gun at them and that was exactly what he wanted to do. The evidence was that Mr. Urbigkit aimed directly at the officers and the bullets came so close to the officers that they could hear them going by their heads. The officers testified that, while Mr. Urbigkit was firing at them, they felt their lives were in danger.

[¶ 48] Giving this evidence every favorable inference which may be reasonably and fairly drawn from it and leaving out of consideration conflicting evidence, we hold that a quorum of reasonable and rational individuals could have concluded from the evidence presented that, when Mr. Urbigkit drove his motor vehicle directly at Agents Wnuk and TeBeest, he injured **and** attempted to injure them with a deadly weapon **and** threatened use of a deadly weapon. The convictions on those two counts of aggravated assault and battery, therefore, are upheld. However, with regard to the other four convictions of aggravated assault and battery, there is no evidence that Deputy Arnold, Deputy Holbrook, Patrolman Dye, or Officer Adkins was injured when Mr. Urbigkit fired his gun at them. Absent evidence that Mr. Urbigkit injured them **and** attempted to injure them **and** threatened them with a deadly weapon, we cannot uphold the jury verdict on those counts. Rather, we must reverse Mr. Urbigkit's convictions for aggravated assault and battery on counts four through seven and remand with directions to the trial court to

enter a judgment of acquittal on those counts. *May*, 2003 WY 14, ¶ 25, 62 P.3d 574.

[¶ 49] As we said in *May* and *Tanner*, it is with frustration that we reverse the convictions as to these counts because the error was so easily avoidable by the state. All that is required is the drafting of more specific charging documents to begin with; amendment of those documents once discovery and investigation clarify the allegations; or, in those cases where the state chooses to present alternative theories, presentation of sufficient evidence of both or inclusion of a special interrogatory verdict form requiring the jury to indicate which theory formed the basis for the conviction. *May*, 2003 WY 14, ¶¶ 26–28, 62 P.3d 574.

## I. Merger of Sentences for Aggravated Assault and Attempted First–Degree Murder

[¶ 50] Mr. Urbigkit claims the sentences for aggravated assault and attempted first-degree murder against Deputy Holbrook, Deputy Arnold, Patrolman Dye, and Officer Adkins must merge because the facts reveal a single criminal act rather than multiple or distinct offenses. *Bilderback v. State*, 13 P.3d 249, 254 (Wyo.2000). Having already reversed the aggravated assault and battery convictions arising out of the acts committed against those law enforcement officials, we do not address Mr. Urbigkit's merger claim.

## J. Failure to Give All Jury Instructions Before Closing Arguments

[¶ 51] At the beginning of the trial, the trial court read Instruction Nos. 1 through 7 to the jury. At the close of the evidence, the trial court did not reread those instructions but read only Instruction Nos. 8 through 46. Citing Wyo. Stat. Ann. § 7–11–201 (LexisNexis 2001) and W.R.Cr.P. 30, Mr. Urbigkit claims it was error for the trial court not to read all the instructions after the close of the evidence. Because no objection was made, the plain error doctrine applies—Mr. Urbigkit must demonstrate that a clear and unequivocal rule of law was violated in a clear and obvious way and he was denied a substantial right or materially prejudiced as a result.

[¶ 52] Section 7–11–201(a)(vi) provides in relevant part as follows:

(a) After the jury has been impaneled and sworn, the trial shall proceed in the following order:

. . .

(vi) Before the argument of the case is begun, the court shall immediately, and before proceeding with other business, charge the jury.

W.R.Cr.P. 30 provides in part as follows:

(a) ... Before the argument of the case to the jury has begun, the court shall give to the jury such instructions on the law as may be necessary....

(b) ... Before opening statements, the court shall provide jurors with any general and case-specific instructions that would seem likely to help jurors understand their function during trial, and the issues that they will be required to decide. These preliminary instructions should include any pertinent case-specific instructions that the court anticipates including in the final jury instructions, if the court concludes that it would be helpful to jurors to receive the instructions both at the beginning of the case and again before closing arguments.

Mr. Urbigkit argues these provisions required the trial court to give all the instructions at the close of the evidence, even those previously given before opening statements. Given the language of the provisions, he cannot show that the trial court violated a clear and unequivocal rule of law in a clear and obvious way.

[¶ 53] Section 7–11–201(a)(vi) provides only that the trial court must charge the jury before argument of the case begins. It does not preclude the court from giving some instructions before opening statements or require that all instructions be given again just before closing arguments. W.R.Cr.P. 30 likewise requires the court to give instructions before closing arguments but does not prevent the court from reading some instructions before opening statements. In fact, the rule expressly authorizes the court to give preliminary instructions likely to help the jury understand its function before opening statements. Under both the statute and the rule, it was well within the trial court's discretion to give the presump-

tion of innocence instruction before opening statements. While it may be advisable to also give the instruction again before closing arguments, it was not plain error for the trial court not to reread the instruction. The instruction was read before opening statements, defense counsel had the opportunity to remind the jury of the instruction during closing arguments, and the instruction was given to the jury along with the other instructions when it retired to the jury room to deliberate so it had the opportunity to review it. We find no reversible error on this issue.

## K. Imposition of Multiple and Consecutive Life Sentences

[¶ 54] Mr. Urbigkit claims the habitual criminal statute, Wyo. Stat. Ann. § 6–10–201 (LexisNexis 2001), provides for punishment by imprisonment for "life," not life for each conviction. On this basis, he asserts the trial court exceeded its statutory authority when it imposed multiple sentences of life in prison.

[¶ 55] When a criminal sentence is within the parameters set by the legislature, it will not be disturbed absent an abuse of discretion. *Dodge v. State*, 951 P.2d 383, 385 (Wyo.1997). Section 6–10–201 (emphasis added) provides:

(a) A person is [a] habitual criminal if:
(i) He is convicted of *a* violent felony; and
(ii) He has been convicted of a felony on two (2) or more previous charges separately brought and tried which arose out of separate occurrences in this state or elsewhere.
(b) [A] habitual criminal shall be punished by imprisonment for:
(i) Not less than ten (10) years nor more than fifty (50) years, if he has two (2) previous convictions;
(ii) Life, if he has three (3) or more previous convictions.

In *Lacey v. State*, 803 P.2d 1364, 1372 (Wyo. 1990) (citation omitted), we said:

The purpose of the habitual criminal statute is to provide additional punishment for people who have not been deterred by previous penalties. That purpose applies regardless of whether the habitual criminal commits more than one felony during a single occurrence or more than one felony

in separate occurrences. We hold that the district court did not abuse its discretion when it enhanced two sentences for two convictions arising out of a single occurrence.

For the same reasons, we hold that the trial court did not abuse its discretion when it enhanced each sentence for each conviction of a violent felony arising out of the February 7, 2001, occurrence.

[¶ 56] Mr. Urbigkit also contends the trial court violated his right to be free from double jeopardy when it used prior convictions in 1983, 1987, and 1997 to enhance each of his aggravated assault convictions. In *Kearns v. State*, 2002 WY 97, ¶ 24, 48 P.3d 1090, ¶ 24 (Wyo.2002), we said:

The intent behind Wyoming's habitual criminal statute is to provide enhanced punishment to an individual who has engaged in a pattern of violent criminal conduct. For that reason, the fact that some prior crimes have already been used to enhance a sentence does not preclude the use of the same crimes to enhance a later sentence.... " '... A habitual criminal statute does not punish a defendant for his previous offenses but for his persistence in crime, and it has been said that to be a habitual criminal involves a status rather than the commission of a separate offense.' " *Evans* [*v. State* ], 655 P.2d [1214,] 1220–21 [ (Wyo.1982) ] (quoting 39 Am. Jur.2d, *Habitual Criminals and Subsequent Offenders*, § 2, pp. 308–310 (1968)).

Thus, the use of Mr. Urbigkit's prior convictions to enhance his aggravated assault convictions did not violate his right against double jeopardy.

## L. Cumulative Error

[¶ 57] Finally, Mr. Urbigkit claims his convictions must be reversed on the basis that cumulative error occurred at trial. Having rejected all but one of his claims of error, we find no cumulative error warranting reversal.

[¶ 58] Affirmed in part, reversed in part, and remanded.