# IN THE SUPREME COURT, STATE OF WYOMING

# 2026 WY 43

APRIL TERM, A.D. 2026

April 20, 2026

SUSANNE JACQUELINE MAYEUX,

Appellant
(Defendant),

v.

S-25-0178

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Uinta County*
*The Honorable James C. Kaste, Judge*

*Representing Appellant:*
Office of the State Public Defender: Patricia L. Bennett, Wyoming State Public Defender;* Kirk A. Morgan, Chief Appellate Counsel; Jeremy Meerkreebs, Senior Assistant Appellate Counsel. Argument by Mr. Meerkreebs.

*Representing Appellee:*
Keith G. Kautz, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; Kristine D. Rude, Assistant Attorney General. Argument by Ms. Rude.

*Before BOOMGAARDEN, C.J., and GRAY, FENN, JAROSH, and HILL, JJ*

* An order substituting Patricia L. Bennett for Brandon T. Booth was entered on April 15, 2026.

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**GRAY, Justice.**

[¶1]     After a jury trial, Susanne Jacqueline Mayeux was convicted of aggravated assault and battery and interference with a peace officer.  She argues the district court erred by declining to give the jury her proposed jury instruction defining "serious bodily injury" and the State presented insufficient evidence at trial to sustain her convictions.  We affirm.

### ISSUES

[¶2]     Ms. Mayeux raises three issues:

>    1.     Did the district court err when it declined to give Ms. Mayeux's proposed jury instruction defining "serious bodily injury"?
>
>    2.     Did the State present sufficient evidence at trial to support Ms. Mayeux's aggravated assault and battery conviction?
>
>    3.     Did the State present sufficient evidence at trial to support Ms. Mayeux's interference with a peace officer conviction?

### FACTS

[¶3]     Ms. Mayeux was staying with her elderly mother, Jo Ann Rasmussen, in Jo Ann and James Rasmussen's Evanston, Wyoming home, while Mr. Rasmussen was in a rehabilitation facility in Utah.  James Rasmussen is Jo Ann Rasmussen's husband and Ms. Mayeux's stepfather.  On February 23, 2024, Mr. Rasmussen asked his adult daughter, Jami Brackin, to pick up his wallet from Ms. Rasmussen because he needed his driver's license to change his power of attorney.  Ms. Rasmussen is Ms. Brackin's stepmother.[1]  Ms. Brackin arrived at the Rasmussen home between 10:30 and 11:00 a.m. and parked her vehicle in the three-lane sloped driveway.  She went to the front door and knocked.  Ms. Rasmussen came to the door but did not open it.  Ms. Brackin identified herself and asked if she could come inside.  Ms. Rasmussen said no.  Ms. Brackin then heard Ms. Mayeux join Ms. Rasmussen at the door.  Ms. Mayeux did not open the door but asked Ms. Brackin, "What do you want, Jami?"  When Ms. Brackin told Ms. Mayeux that she was there to pick up her father's wallet, Ms. Mayeux said, "[H]e doesn't need his wallet, and it's in a safe place."  Ms. Brackin asked to come inside and discuss the matter, but Ms. Mayeux said no.  Ms. Brackin returned to her car and called her father to relay what had occurred.  Because

---

[1] Ms. Rasmussen has since died, but we refer to the relationships as they existed on February 23, 2024.

her father still wanted his wallet, Ms. Brackin called the police for a "keep the peace" while she retrieved the wallet.[2]

[¶4]    About ten minutes later, Officers Colton Welling and Rebecca Landes from the Evanston Police Department arrived at the Rasmussen home and parked their vehicles in the street.  Ms. Brackin met the officers at the bottom of the driveway.  While Ms. Brackin was explaining the situation to them, a silver car pulled into the driveway and parked in the RV lane adjacent to the driveway.  Because she and the officers did not recognize the driver or the vehicle, Ms. Brackin began walking up the driveway toward the vehicle to determine who was driving.  Lizette Pace, a friend of the Rasmussens, exited the vehicle.  Ms. Brackin knew Ms. Pace and asked her why she was there.  Ms. Pace stated Ms. Rasmussen had called her and she had come to help Ms. Rasmussen.

[¶5]    While Ms. Brackin was talking with Ms. Pace, the garage door for the driveway lane nearest the RV lane opened, and Ms. Mayeux began slowly backing her Tesla from the garage.  Ms. Rasmussen was in the Tesla's front passenger seat.  Ms. Brackin, who was standing in the driveway lane directly behind the Tesla, turned to speak to Officer Welling so that the left side of her body faced the garage and Tesla.  Ms. Brackin saw the Tesla moving out of the corner of her eye and asked Officer Welling, "She's not going to hit me, is she?" Officer Welling answered, "Oh, no.  She's not.  You're fine."  The Tesla continued to back up and struck Ms. Brackin on the left side of her body.  The contact knocked Ms. Brackin, who was wearing high-heeled boots, off balance.  She stepped to face the back of the Tesla and could see Ms. Mayeux looking at her from the rearview mirror.  Because she feared she would fall under the vehicle and be run over, Ms. Brackin attempted to "find a handhold [on the Tesla] so that maybe [she] could lift [her] feet up and just ride so that [she] wouldn't fall under the car.  But there was nothing to hang on to."  The Tesla continued to push Ms. Brackin down the driveway until Officer Landes slapped its rear window, at which time the Tesla stopped.

[¶6]    Once the Tesla stopped, the officers asked Ms. Mayeux to roll down her window and provide a driver's license, proof of insurance, and vehicle registration.  Ms. Mayeux opened the window about four inches, said she was contacting her attorney, and closed the window.  Because Ms. Mayeux would not provide the officers with the requested documentation, Officer Landes called in the Tesla's license plate number to dispatch.  Dispatch stated the vehicle was registered to Ms. Mayeux, and Ms. Brackin confirmed it was Ms. Mayeux driving the Tesla.  Officer Landes again asked Ms. Mayeux for her driver's license, proof of insurance, and vehicle registration.  Ms. Mayeux cracked the window, said she was still waiting to hear from her attorney, and refused to provide the requested items.  While the officers believed they had grounds to remove Ms. Mayeux from

---

[2] Officer Welling testified that during a "keep the peace," also called a "civil oversee," police officers are dispatched to the scene to "stand by to make sure . . . the parties at said location[] are safe and that no laws are being violated."

the vehicle and arrest her, they decided instead to leave the scene and turn the matter over to the local district attorney.

[¶7]   Ms. Brackin returned to her car and called Mr. Rasmussen to inform him that Ms. Rasmussen was not going to give her his wallet.  She then drove to Park City, Utah, for work.  Once in Park City, she noticed "[e]verything hurt" and there was a bruise on her left knee.  The next day, she went to the emergency room where X-rays revealed she had "a tweak in [her] hip.  [Her] hip was off."

[¶8]   The State charged Ms. Mayeux with one count of felony aggravated assault and battery in violation of Wyo. Stat. Ann. § 6-2-502(a)(ii) and one count of misdemeanor interference with a peace officer in violation of Wyo. Stat. Ann. § 6-5-204(a).  After a two-day trial, the jury found her guilty of both counts.  The district court sentenced Ms. Mayeux to a total term of 54–60 days in jail and fined her $10,000.  Ms. Mayeux timely appealed.

## DISCUSSION

### I.   Did the district court err when it declined to give Ms. Mayeux's proposed jury instruction defining "serious bodily injury"?

[¶9]   The State charged Ms. Mayeux with aggravated assault and battery under Wyo. Stat. Ann. § 6-2-502(a)(ii), which prohibits a person from "intentionally or knowingly caus[ing] bodily injury to another with a deadly weapon[.]"  The terms "bodily injury" and "deadly weapon" are defined in Wyo. Stat. Ann. § 6-1-104.  "'Bodily injury' means[] . . . [a] cut, abrasion, burn or temporary disfigurement; . . . [p]hysical pain; or . . . [i]mpairment of the function of a bodily member, organ or mental faculty."  Wyo. Stat. Ann. § 6-1-104(a)(i)(A)–(C).  "'Deadly weapon' means but is not limited to a firearm, explosive or incendiary material, motorized vehicle, an animal or other device, instrument, material or substance, which in the manner it is used or is intended to be used is reasonably capable of producing death or serious bodily injury[.]"  Wyo. Stat. Ann. § 6-1-104(a)(iv).

[¶10]  Prior to trial, the State filed its proposed jury instructions, including an instruction outlining the elements of aggravated assault and battery.  The elements instruction told the jury that to find Ms. Mayeux guilty of aggravated assault and battery, it had to find beyond a reasonable doubt that she knowingly caused "[b]odily injury to another, Jami Brackin[,] . . . [w]ith a deadly weapon."  The State also proposed an instruction providing the jury with the statutory definitions of "bodily injury" and "deadly weapon."

[¶11]  Ms. Mayeux did not object to the State's proposed instructions but asked the district court to include an instruction with the definition of "serious bodily injury" from Wyo. Stat. Ann. § 6-1-104(a)(x).  She proposed the following instruction:

3

"Serious [b]odily injury" means bodily injury which: creates a substantial risk of death; causes severe protracted physical pain; causes severe disfigurement or protracted loss or impairment of a bodily function; causes unconsciousness or a concussion resulting in protracted loss or impairment of the function of a bodily member, organ or mental faculty; causes burns of the second or third degree over a significant portion of the body; or causes a significant fracture or break of a bone.

Ms. Mayeux acknowledged that to be guilty of the offense of aggravated assault and battery, the State need only show she caused "bodily injury," not "serious bodily injury," to Ms. Brackin. Nevertheless, she argued the instruction was necessary because the offense requires use of a "deadly weapon" and the statutory definition of "deadly weapon" requires the weapon to be "reasonably capable of producing death *or serious bodily injury*." Wyo. Stat. Ann. § 6-1-104(a)(iv) (emphasis added).

[¶12]   The district court gave the jury the State's proposed jury instructions but declined to give Ms. Mayeux's proposed jury instruction. It determined that under Wyo. Stat. Ann. § 6-1-104(a)(iv), "a motorized vehicle is a deadly weapon . . . if in the manner it is used or is intended to be used, [it] is reasonably capable of producing death or serious bodily injury." It decided, however, that "serious bodily injury" did not need to be defined for the jury as "any reasonable juror would know that if a vehicle is used in a manner that is purposeful or intentional, it could very easily be a deadly weapon." The court was also concerned that if it gave the jury Ms. Mayeux's proposed instruction, the jury may erroneously conflate "bodily injury" in the elements instruction with "serious bodily injury" in the proposed instruction, thereby inadvertently increasing the State's burden of proof.

[¶13]   Ms. Mayeux argues the district court erred by refusing to give the jury her proposed jury instruction. While she acknowledges she did not need to cause Ms. Brackin "serious bodily injury" to be guilty of aggravated assault and battery, she contends she did have to cause her "bodily injury" with a "deadly weapon." According to Ms. Mayeux, the definition of "deadly weapon" requires her to have used or intended to use the Tesla in a manner which is "reasonably capable of producing death or serious bodily injury," and it was necessary to provide the jury with the definition of "serious bodily injury" so it could determine whether the Tesla was a "deadly weapon." Ms. Mayeux also argues there was evidence supporting the giving of the instruction as the jury could have found that Ms. Mayeux was using the Tesla in a manner which was not capable of producing death or serious bodily injury. She claims the evidence showed the Tesla was traveling at a maximum speed of 5 mph when it contacted Ms. Brackin, forcing her to walk down the driveway, and the contact caused Ms. Brackin only bruising and muscular pain.

4

[¶14]  Ordinarily, we review a district court's refusal to give a proposed jury instruction for an abuse of discretion.  *Schnitker v. State*, 2017 WY 96, ¶ 7, 401 P.3d 39, 41 (Wyo. 2017).  *See also Luedtke v. State*, 2005 WY 98, ¶ 28, 117 P.3d 1227, 1232 (Wyo. 2005) (A district court "is given wide latitude in instructing the jury and, as long as the instructions correctly state the law and the entire charge covers the relevant issue, reversible error will not be found." (quoting *Giles v. State*, 2004 WY 101, ¶ 14, 96 P.3d 1027, 1031 (Wyo. 2004))).  Resolution of this issue, however, turns on the interpretation of Wyo. Stat. Ann. § 6-1-104(a)(iv), the statute defining "deadly weapon."  "Statutory interpretation is a question of law reviewed de novo."  *Bernal-Molina v. State*, 2021 WY 90, ¶ 8, 492 P.3d 904, 907 (Wyo. 2021) (citation omitted).  "In interpreting a statute, 'we seek the legislature's intent as reflected in the plain and ordinary meaning of the words used in the statute,' giving effect to every word, clause, and sentence."  *Id.* ¶ 13, 492 P.3d at 908 (quoting *Blevins v. State*, 2017 WY 43, ¶ 27, 393 P.3d 1249, 1256 (Wyo. 2017) (quoting *In Int. of JB*, 2017 WY 26, ¶ 12, 390 P.3d 357, 360 (Wyo. 2017))).

[¶15]  The district court determined a motorized vehicle is a "deadly weapon" under Wyo. Stat. Ann. § 6-1-104(a)(iv) if, in the manner it is used or is intended to be used, it is reasonably capable of producing death or serious bodily injury.  This interpretation of Wyo. Stat. Ann. § 6-1-104(a)(iv) is contrary to our interpretation of that statute.  *See Dike v. State*, 990 P.2d 1012 (Wyo. 1999).

[¶16]  In *Dike*, the appellant, Mr. Dike, pointed an unloaded firearm at the victim's head.  *Dike*, 990 P.2d at 1017–18.  The State charged him with aggravated assault and battery under Wyo. Stat. Ann. § 6-2-502(a)(iii), which prohibits a person from "threaten[ing] to use a drawn deadly weapon on another . . . ."  *Id.* at 1017–18.  The district court instructed the jury that a firearm is a "deadly weapon" and the jury found Mr. Dike guilty.  *Id.* at 1017, 1019.  On appeal, Mr. Dike argued the State presented insufficient evidence that he threatened "to use a drawn deadly weapon" on the victim because an unloaded firearm is not a "deadly weapon."  *Id.* at 1016–18.  He relied on Wyo. Stat. Ann. § 6-1-104(a)(iv), which, as we explained above, states:

> (iv)  "Deadly weapon" means but is not limited to a firearm, explosive or incendiary material, motorized vehicle, an animal or other device, instrument, material or substance, *which in the manner it is used or is intended to be used is reasonably capable of producing death or serious bodily injury*[.]

*Id.* at 1018 (emphasis added).  Mr. Dike claimed the italicized phrase—"which in the manner it is used or is intended to be used is reasonably capable of producing death or serious bodily injury"—qualified each of the previously listed items, including "a firearm."  *Id.*  As a result, he argued an unloaded firearm is not a "deadly weapon" because it is not reasonably capable of producing death or serious bodily injury.  *Id.* at 1016, 1018.  He also argued the district court denied him his right to a fair trial by instructing the jury that a

5

firearm is a "deadly weapon" because the jury should have been permitted to determine whether an unloaded firearm qualifies as a "deadly weapon." *Id.* at 1019.

[¶17]   We rejected both of Mr. Dike's arguments. *Id.* at 1018–19.   After "applying rules of common grammatical principles" to Wyo. Stat. Ann. § 6-1-104(a)(iv), we concluded:

> [T]he language [of the statute] is clear and unambiguous.   The phrase "which in the manner it is used" modifies only the last antecedent, "other device, instrument, material or substance." "[O]ther device" is preceded by an "or," and, generally, where no contrary intention appears, relative and qualifying words and phrases are construed to refer solely to the last antecedent with which they are closely connected. *Moschetti v. Liquor Licensing Authority of City of Boulder*, 176 Colo. 281, 490 P.2d 299, 301–02 (1971) (en banc).

*Id.* at 1018 (emphasis added).   Because the phrase—"which in the manner it is used or is intended to be used is reasonably capable of producing death or serious bodily injury"— did not modify the term "a firearm," we determined "the 'deadly weapon' definition includes unloaded firearms." *Id.* at 1019.   Based on this interpretation, we also decided the district court correctly instructed the jury that a firearm is a "deadly weapon" because "an unloaded firearm is by definition a 'deadly weapon.'   This determination is, therefore, not one to be made by the jury." *Id.*

[¶18]   The legislature has not amended Wyo. Stat. Ann. § 6-1-104(a)(iv) (the statutory definition of "deadly weapon") since *Dike*.   The interpretation of the statute from *Dike* is controlling. *Marfil v. State*, 2016 WY 12, ¶ 23, 366 P.3d 969, 975 (Wyo. 2016) ("[W]hen this Court interprets a statute and the legislature makes no material legislative change in the provision thereafter, the legislature is presumed to acquiesce in the Court's interpretation." (quoting *Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 2015 WY 127, ¶ 27, 357 P.3d 1118, 1127 (Wyo. 2015))).   In Wyo. Stat. Ann. § 6-1-104(a)(iv), the phrase—"which in the manner it is used or is intended to be used is reasonably capable of producing death or serious bodily injury"—modifies only the last antecedent—"other device, instrument, material or substance."   It does not modify "motorized vehicle," which, like the term "a firearm," is listed before and separate from the last antecedent.   A "motorized vehicle" is by definition a "deadly weapon" regardless of whether, in the manner in which it was used or intended to be used, it was reasonably capable of producing death or serious bodily injury.

[¶19]   Ms. Mayeux acknowledges that in *Dike* we "interpreted a firearm to be a deadly weapon without requiring the possibility of reasonably producing death or serious bodily injury."   She nevertheless emphasizes the following statement from our *Dike* decision:

6

The aggravated assault [and battery] statute enhances the punishment if the defendant uses a deadly weapon because deadly weapons cause a greater degree of fear in the person being assaulted. The victim does not know that the firearm is not loaded, and his apprehension and consequent reactions will be the same as if the firearm were loaded. He may try to escape or defend himself, conceivably putting himself and others into a precarious and dangerous situation.

*Dike*, 990 P.2d at 1018–19. She then attempts to distinguish an unloaded firearm from a slow-moving vehicle, claiming that unlike an unloaded firearm, a victim would know the general speed of a vehicle approaching her and therefore any fear or reactions from the victim would not be a result of the driver's actions. The discussion in *Dike* of one possible reason the legislature may have increased the punishment for use of a deadly weapon such as an unloaded firearm—to account for the fear generated by a deadly weapon—was illustrative only. It does not add any additional requirements to the statutory definition of "deadly weapon" set forth in Wyo. Stat. Ann. § 6-1-104(a)(iv).[3]

[¶20] Because a "motorized vehicle" is a "deadly weapon" under Wyo. Stat. Ann. § 6-1-104(a)(iv), regardless of whether it was used or intended to be used in a manner that is reasonably capable of producing death or serious bodily injury, the district court erred in

---

[3] Ms. Mayeux also compares her actions of driving the Tesla slowly out of her mother's driveway toward Ms. Brackin to two aggravated assault and battery cases involving vehicles where, she claims, we looked to the manner in which the vehicles were used to determine whether they could cause serious bodily injury and therefore whether they were a "deadly weapon." *See Carey v. State*, 984 P.2d 1098 (Wyo. 1999); *Urbigkit v. State*, 2003 WY 57, ¶ 46, 67 P.3d 1207, 1225 (Wyo. 2003), *abrogated on other grounds by TJS v. State*, 2005 WY 68, 113 P.3d 1054 (Wyo. 2005). In *Carey*, a jury found Mr. Carey guilty of three counts of aggravated assault and battery. *Carey*, 984 P.2d at 1099. He argued the district court erred by failing to give his requested instructions on the lesser included offenses of simple assault and battery because the jury could have found his motor vehicle was not a "deadly weapon" under Wyo. Stat. Ann. § 6-1-104(a)(iv), a necessary element of aggravated assault and battery. *Id.* at 1101. We concluded there was no error because a "rational juror could conclude only that [Mr. Carey's] vehicle was being used in a manner reasonably capable of producing death or serious bodily injury" where the evidence showed he drove his vehicle into an occupied vehicle and toward an officer. *Id.* Because *Carey* was decided prior to our decision in *Dike*, to the extent it concluded a motor vehicle must be "reasonably capable of producing death or serious bodily injury" to be a "deadly weapon," it is not controlling. In *Urbigkit*, the State charged Mr. Urbigkit with aggravated assault and battery and the jury was instructed it could find him guilty if he (1) attempted to cause bodily injury to the victim with a deadly weapon (motor vehicle), (2) knowingly caused bodily injury to the victim with a deadly weapon (motor vehicle), or (3) threatened the victim with a deadly weapon (motor vehicle). *Urbigkit*, ¶ 41, 67 P.3d at 1223–24. We concluded the district court committed plain error when, in answer to a jury question, it told the jury that the State did not have to prove all three theories. *Id.* ¶¶ 41, 43, 67 P.3d at 1224. We nevertheless concluded the error did not deny Mr. Urbigkit a substantial right or result in material prejudice because there was sufficient evidence to support a guilty verdict on all three theories. *Id.* ¶¶ 43, 45–46, 67 P.3d at 1224–25. That resolution is distinguishable from this case because it turned on whether there was sufficient evidence of an injury, not whether the vehicle was a "deadly weapon." *Id.* ¶¶ 45–46, 48, 67 P.3d at 1225.

interpreting the statute otherwise. Despite its interpretive error, the court correctly declined to give the jury Ms. Mayeux's proposed jury instruction. The proposed instruction was based on Ms. Mayeux's contention that the phrase "which in the manner it is used or is intended to be used is reasonably capable of producing death or serious bodily injury" in Wyo. Stat. Ann. § 6-1-104(a)(iv) modifies "motorized vehicle." As explained here, it does not and there was no need for the jury to be instructed on the definition of "serious bodily injury."

## II.     *Did the State present sufficient evidence at trial to support Ms. Mayeux's aggravated assault and battery conviction?*

[¶21] Ms. Mayeux argues the State presented insufficient evidence at trial to support her aggravated assault and battery conviction, namely, that she used a "deadly weapon" to cause bodily injury to Ms. Brackin. As with her first issue, she contends a motorized vehicle is only a "deadly weapon" when it is used in a manner that is reasonably capable of producing death or serious bodily injury. She contends that even taking the evidence in the light most favorable to the State and giving it every favorable inference, the Tesla was not a "deadly weapon" where it was traveling at a maximum speed of 5 mph and caused Ms. Brackin only muscular pain and bruising.

[¶22] When reviewing whether the State presented sufficient evidence to support a conviction, "we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt." *Thunder v. State*, 2023 WY 74, ¶ 7, 533 P.3d 175, 177 (Wyo. 2023) (quoting *Ogden v. State*, 2022 WY 111, ¶ 13, 516 P.3d 870, 874 (Wyo. 2022)). In making this determination, we examine the evidence in the light most favorable to the State, disregard any evidence favorable to the defendant that conflicts with the State's evidence, and do not reweigh the evidence or reconsider the credibility of the witnesses. *Id.* (quoting *Ogden*, ¶ 13, 516 P.3d at 874).

[¶23] Ms. Mayeux's sufficiency of the evidence argument suffers from the same flaw as her argument concerning the district court's refusal to give the jury her proposed jury instruction defining "serious bodily injury." As we have explained, a "motorized vehicle" is a "deadly weapon" under Wyo. Stat. Ann. § 6-1-104(a)(iv) regardless of whether it is used or intended to be used in a manner which is reasonably capable of producing death or serious bodily injury. Accordingly, the State had to show that Ms. Mayeux knowingly caused "bodily injury" to Ms. Brackin with the Tesla because the Tesla, as a "motorized vehicle," is by definition a "deadly weapon." *See* Wyo. Stat. Ann. § 6-1-104(a)(iv). Ms. Mayeux does not contend the State did not meet that burden or that a jury could not have reasonably concluded beyond a reasonable doubt that Ms. Mayeux caused "bodily injury" to Ms. Brackin with the Tesla. The evidence showed Ms. Mayeux struck Ms. Brackin with the Tesla and Ms. Brackin suffered physical pain, a bruise to her knee, and a tweak of her hip as a result of the contact. *See* Wyo. Stat. Ann. § 6-1-104(a)(i)(A)–(C) (defining "bodily

injury" as "[a] cut, abrasion, burn or temporary disfigurement; . . . [p]hysical pain; or . . . [i]mpairment of the function of a bodily member, organ or mental faculty").

### III. Did the State present sufficient evidence at trial to support Ms. Mayeux's interference with a peace officer conviction?

[¶24]   Ms. Mayeux argues the State presented insufficient evidence at trial to convict her of interference with a peace officer.  As with Ms. Mayeux's second issue, we ask whether a jury could reasonably find the State had proven each of the elements of the crime beyond a reasonable doubt.  *Thunder*, ¶ 7, 533 P.3d at 177 (quoting *Ogden*, ¶ 13, 516 P.3d at 874).  In making this determination, we examine the evidence in the light most favorable to the State, disregard any evidence favorable to Ms. Mayeux that conflicts with the State's evidence, and do not reweigh the evidence or reexamine witness credibility.  *Id.* (quoting *Ogden*, ¶ 13, 516 P.3d at 874).

[¶25]   Ms. Mayeux was found guilty of interference with a peace officer under Wyo. Stat. § 6-5-204(a).  Relevant here, that statute prohibits a person from "knowingly obstruct[ing], imped[ing] or interfer[ing] with . . . a peace officer while engaged in the lawful performance of his official duties."  Wyo. Stat. Ann. § 6-5-204(a).  To demonstrate Ms. Mayeux violated § 6-5-204(a), the State had to prove beyond a reasonable doubt that "(1) the crime occurred within [Uinta County, Wyoming, on February 23, 2024], and (2) [she] knowingly obstructed, impeded, or interfered with . . . (3) . . . a peace officer (4) engaged in the lawful performance of his official duties."  *Walter v. State*, 811 P.2d 716, 719 (Wyo. 1991) (citing *Saldana v. State,* 685 P.2d 20, 22 (Wyo. 1984)).

[¶26]   The State presented uncontroverted evidence that the interference offense occurred on February 23, 2024, in Uinta County, Wyoming, and that Officer Welling and Officer Landes were peace officers.  Ms. Mayeux challenges only the sufficiency of the evidence on the second and fourth elements.  She contends the interference conviction cannot stand because (1) she was not legally obligated to identify herself to Officer Welling and Officer Landes or answer their questions (fourth element) and (2) her failure to provide them her driver's license, proof of insurance, and vehicle registration did not "interfere" with the officers' investigation (second element).  We address each argument.

### A.   Lawful Performance of Official Duties

[¶27]   Ms. Mayeux argues Officer Welling and Officer Landes were not engaged in the lawful performance of their official duties because they had no right to demand that she identify herself or answer their questions.  She contends she has a constitutional right to remain silent and points out that, unlike other states, Wyoming does not have a statute requiring a person to identify herself to law enforcement.  Our review of the legality of the officers' actions is a question of law, which we review de novo.  *Woods v. State*, 2023 WY 32, ¶ 13, 527 P.3d 264, 267 (Wyo. 2023).

[¶28] The record does not support Ms. Mayeux's claim that the interference charge was based on her failure to identify herself or to answer the officers' questions. Officer Landes' affidavit states she asked Ms. Mayeux for her driver's license, proof of insurance, and vehicle registration. The affidavit does not state or suggest that either officer asked Ms. Mayeux to identify herself or to answer questions of that nature and no such evidence was presented at trial.

[¶29] Ms. Mayeux contends the prosecutor argued during closing that one basis for the interference charge was her failure to identify herself. She mischaracterizes the prosecutor's comments. While the prosecutor told the jury that Ms. Mayeux "refused to interact with law enforcement," when the argument is viewed as a whole, it is clear that the prosecutor was referring to Ms. Mayeux's refusal to provide the officers with her driver's license, proof of insurance, and vehicle registration. Ms. Mayeux also asserts the district court, in its remarks denying her motion for judgment of acquittal, incorrectly stated she violated the law when she "refused to provide responses to [the officers'] reasonable and lawful requests." She argues she had a right to remain silent and had no duty under Wyoming law to identify herself. Ms. Mayeux quotes only part of the court's statement. In full, the court said: "[A] reasonable jury could find [Ms. Mayeux] interfered [with Officers Landes and Welling] when she refused to provide responses to their reasonable and lawful requests *for her driver's license, registration, and insurance*." (Emphasis added.)

[¶30] It is clear from the record that the interference charge was based on Ms. Mayeux's failure to provide Officer Welling and Officer Landes with her driver's license, proof of insurance, and vehicle registration. While she argues her failure to provide these documents did not "interfere" with the officers' investigation—an issue we address below—Ms. Mayeux does not contend the officers were acting unlawfully when they requested these documents. In fact, she acknowledges she was statutorily obligated to provide them. *See, e.g.*, Wyo. Stat. Ann. §§ 31-2-204(a) (requirement to display vehicle registration upon police officer's demand), 31-4-103(b) (requirement to produce proof of insurance upon issuance of a citation for a moving violation), 31-7-116 (requirement to display driver's license to officer upon demand). The State presented sufficient evidence to show that Officer Welling and Officer Landes were engaged in the lawful performance of their duties when they requested these items. The officers responded to the Rasmussen home to "keep the peace." Officer Landes testified that while at the Rasmussen home, she saw Ms. Brackin get hit by the Tesla. Officer Welling testified that although he did not see the impact, he did see Ms. Brackin "stumbling backwards" and heard her say, "[s]he hit me." Because they had observed a "traffic incident" and a possible crime, the officers began an investigation, which included identifying the responsible party and seeking a driver's license, vehicle registration, and proof of insurance from the driver. Requesting these items from the driver as part of their investigation of the traffic incident was lawful. *Cf. Hanson v. State*, 2025 WY 56, ¶ 29, 568 P.3d 1186, 1193 (Wyo. 2025) ("During a

10

routine traffic stop, a law enforcement officer may request a driver's license, proof of insurance and vehicle registration, run a computer check, and issue a citation." (quoting *Harris v. State*, 2018 WY 14, ¶ 17, 409 P.3d 1251, 1254 (Wyo. 2018))).

## B.    Interference

[¶31]   Ms. Mayeux argues the State presented insufficient evidence at trial showing her failure to provide Officer Welling and Officer Landes with her driver's license, proof of insurance, and vehicle registration "interfered" with their investigation of the traffic incident.   She claims her failure to provide the officers with the requested documents did not interfere with or impede their investigation because they were able to obtain her name through dispatch and confirm her identity with Ms. Brackin.   Ms. Mayeux argues the officers' investigation "was entirely unimpeded and unobstructed" as evidenced by the fact she was "easily identified, charged, tried, and convicted without the officers ever having to take a single remedial step or action[.]"   She points out she did not falsely identify herself, obscure her identity, provide false documents, or otherwise lie to the officers.   Rather, she "merely obliged the [officers] to obtain the information they sought from sources other than herself" which were readily available to them "and in taking advantage of these sources the [officers] were not even inconvenienced, much less impeded."

[¶32]   Ms. Mayeux's argument is based on an incorrect reading of the interference with a peace officer statute, as well as the mistaken notion that the only purpose for requesting the documents was to secure her identity.   The misdemeanor interference statute, which, as pointed out above, prohibits a person from "knowingly obstruct[ing], imped[ing] or interfer[ing] with" a peace officer engaged in the lawful performance of his official duties, "was made purposefully broad to cover actions which might not be otherwise unlawful, but which obstructed or hindered law enforcement officers in carrying out their duties." *Garza v. State*, 2020 WY 32, ¶ 12, 458 P.3d 1239, 1242 (Wyo. 2020) (quoting *Newton v. State*, 698 P.2d 1149, 1152 (Wyo. 1985)).   "We have said that '"to interfere" is defined as to check or hamper the action of the officers or to do something which hinders or prevents or tends to prevent the performance of his legal duties.'" *Id.* (quoting *Tillett v. State*, 637 P.2d 261, 265 n.2 (Wyo. 1981)).   "We have also observed: 'Each of the three words, "obstructs," "impedes" and "interferes," is a word of common usage and accepted meaning by those of ordinary intelligence.   Dictionary synonyms include such words as "hinder," "intermeddle," "deter," "hamper," "prevent," "delay," "thwart" and "inhibit."'" *Id.* (quoting *Newton*, 698 P.2d at 1152).   Properly construed, there was more than sufficient evidence by which a jury could find beyond a reasonable doubt that Ms. Mayeux "interfered" with the officers' investigation by failing to provide them with her driver's license, proof of insurance, and vehicle registration because this conduct hindered and delayed their ability to obtain information necessary to their investigation.

[¶33]   After Ms. Brackin was hit by the Tesla, Officer Welling testified the officers had to "identify the responsible party."   Because Ms. Mayeux refused the officers' requests to

supply a driver's license, proof of insurance, and vehicle registration, Officer Landes called dispatch and provided the Tesla's license plate number. While dispatch relayed that the Tesla was registered to Ms. Mayeux, Officer Welling testified that the driver of the vehicle may not be the person to whom the vehicle is registered. The officers, therefore, had to confirm Ms. Mayeux's identity through Ms. Brackin. Even though the officers were able to confirm Ms. Mayeux's identity, Officer Landes testified that a driver's license provides officers more than just the driver's name. It provides them with a photograph of the driver, information about the driver's physical characteristics, and the date of birth. It also gives them information concerning potential contributing factors to the traffic incident, such as the driver's need for corrective lenses. Officer Landes testified that because Ms. Mayeux refused to provide her driver's license to them, she had dispatch email her the information from Ms. Mayeux's license. While dispatch provided her with some information, it did not provide the photograph associated with Ms. Mayeux's driver's license. Later, Officer Landes had to physically pull up the photograph associated with Ms. Mayeux's license to determine it matched the driver of the Tesla. Neither officer was ever able to confirm that the Tesla was insured.

[¶34] Ms. Mayeux suggests that the evidence was insufficient to support her interference conviction by pointing to things she did not do, such as falsely identify herself or obscure her identity. Resolution of Ms. Mayeux's insufficiency of the evidence argument does not turn on hypotheticals about actions she could have taken. It turns on what the evidence shows she did—or failed to do—and whether a reasonable jury could find from that evidence every element of the offense was proven beyond a reasonable doubt. The interference statute does not require nefarious action, but it does prohibit any conduct— even passive or seemingly minor—that interferes with an officer's lawful performance of duties. *Garza*, ¶ 12, 458 P.3d at 1242 (Wyo. Stat. Ann. § 6-5-204(a) covers "*actions which might not be otherwise unlawful*, but which obstructed or hindered law enforcement officers in carrying out their duties" (emphasis added)); *Tillett*, 637 P.2d at 264 ("The use of actual, direct or threatened force is not indispensable to the commission of the crime of interfering with a police officer.").

[¶35] Finally, Ms. Mayeux suggests that while her failure to provide the officers with her driver's license, proof of insurance, and vehicle registration may have violated other statutes which require her to produce these items, these statutory violations cannot be "bootstrapped" into an interference with a peace officer charge, thereby allowing for a more severe punishment than what the legislature intended for failure to produce these documents. We are not persuaded. "It is not uncommon for two valid statutes to prohibit the same type of conduct[.]" *McArtor v. State*, 699 P.2d 288, 294 (Wyo. 1985). A "prosecutor is vested with the exclusive power to determine who to charge with a crime and with what crime to charge them" and "in the absence of any proof that the prosecution is based on improper reasons such as race or religion, we cannot and will not disturb [the charging] decision." *DeLeon v. State*, 896 P.2d 764, 768 (Wyo. 1995) (citations omitted). *See also Derksen v. State*, 845 P.2d 1383, 1388 (Wyo. 1993) (absent a violation of certain

12

constitutional rights, "[w]hen specific conduct violates more than one criminal statute, the state, at its option, may choose to prosecute for the violation of one statute or for the violation of multiple statutes under appropriate circumstances where multiple punishment is legislatively authorized" (citations omitted)). In this case, the prosecutor decided to charge Ms. Mayeux with interference with a peace officer. Because there is no indication the prosecutor's decision violated any of Ms. Mayeux's constitutional rights or was based on an improper reason, that decision was within the prosecutor's discretion and we are not at liberty to disturb it.

### *CONCLUSION*

[¶36] The district court correctly declined to give the jury Ms. Mayeux's proposed jury instruction defining "serious bodily injury." The State presented sufficient evidence at trial to support Ms. Mayeux's convictions for aggravated assault and battery and interference with a peace officer. We affirm.